PHŒNIX BRIDGE COMPANY *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 26.    Argued November 12, 13, 1908.—Decided November 30, 1908.

In a contract with the Government for the reconstruction of a drawspan bridge which provides for completion before opening of navigation, permission to use false work during construction does not permit such use after the opening of navigation; and where the completion is delayed through negligence of the contractor until after opening of navigation and he is obliged by reason of destruction of the false work to substitute a lift span, he cannot recover the extra cost occasioned thereby.

*Quære* and not decided, whether a receipt for final payment on a Government contract, given without protest, amounts to an accord and satisfaction so as to be a bar to a claim for extra work in connection with the subject-matter of the contract but not specified therein.

38 C. Cl. 492, affirmed.

THE facts are stated in the opinion.

*Mr. Frederic D. McKenney* and *Mr. John Spalding Flannery* for appellant.

*Mr. Assistant Attorney General John Q. Thompson,* with whom *Mr. A. C. Campbell* was on the brief, for appellee.

MR. JUSTICE WHITE delivered the opinion of the court.

This appeal is prosecuted to obtain the reversal of a judgment rejecting a claim of the Phœnix Bridge Company for $6,958.14. The bridge company based its right to recover upon the averment that, during the performance of a contract entered into by it with the United States for the partial reconstruction and remodelling of a bridge belonging to the United States, spanning the Mississippi River between Davenport, Iowa, and Rock Island, Illinois, the company had, under the orders of the United States officer in charge of the work, expended the amount claimed for work not specified in the contract, and for the value of which therefore the United States came under an obligation to respond. Not following the precise order in which the court below recited the facts by it found, we reproduce from such findings the statements made therein of such facts as are in anywise pertinent to the questions which we think the controversy involves.

In July, 1895, the Government of the United States issued a circular advertisement, signed by A. R. Buffington, Colonel of Ordnance, U. S. Army, inviting proposals for the construction of a new superstructure and making alterations in the abutments and piers of the Government bridge over the Mississippi River connecting Davenport, Iowa, and Rock Island, Illinois. The bridge company in answer to this advertisement submitted a formal proposition, and in addition addressed a letter to Colonel Buffington, dated August 10, 1895, which, among other things, contained the following:

"Col. A. R. Buffington, Col. Ord., Commanding Rock Island
Arsenal, Rock Island, Ill.

"DEAR SIR: Appreciating the importance of finishing the
proposed new bridge at Rock Island at the earliest possible
date we have been making a very careful study of the best
method of removing the present structure and erecting the
new spans, and have finally decided upon a plan which will
enable us to work on the structure regardless of floods and
ice in the river, and thereby give you the work at least five
or six months before the time mentioned in your letter of
July 27th. Our plan of erection is shown in detail on prints 1
and 2 sent herewith.

"The erection of the drawspan of course must be done
during the closing of navigation, between the 20th of Novem-
ber and the 15th of March of the following year, and this span
will be removed in the ordinary manner, by placing false work
in the river to support temporarily the old structure and the
railway traffic during the removal of the present span, and
for supporting the new work during erection, the various
parts being put in position by the ordinary overhead traveler
shown on plan 2. This particular part of the erection does
not need any special explanation. As we have made a specialty
of drawspan work and have every facility in our shops for
building such a span, we have named a date of completion
for the new drawspan of March 1st, 1896. The first small
span, 'E,' we will erect in advance of the drawspan, and will
have the same in position on Feb. 1st, 1896. We erect this
small span in advance of the draw that we may bring these
two spans up to the new grade together."

In August, 1895, the bridge company was notified of the
acceptance of its proposition, such notification stating, how-
ever, that decision upon the character of the stone to be used
and the form of the solid steel railroad floor was reserved.
On October 2, 1895, the contract for the performance of the
work was executed.

At the Rock Island end of the bridge there was a stationary

span, and next to that there was a drawspan, and beyond that there were several more stationary spans, extending to the Iowa end of the bridge.

The plan adopted for the erection of the bridge contemplated the substitution of new material for the old superstructure without interruption to the railroad traffic over the bridge, and the scheme adopted was to carry such traffic upon false work, consisting of timbers extending from the bed of the stream to the old superstructure, for the purpose of supporting the tracks for such traffic. This false work under the drawspan made a barrier across that portion of the stream, which would have rendered navigation impossible in case such false work was not removed prior to the opening of navigation.

The drawspan was intended for the convenience of navigation upon the river, and said draw was the only means that vessels and other craft on the river had of going from one side of the bridge to the other.

The specifications as originally prepared called for the erection of the drawspan by January 1, 1896, and the completion of the bridge on November 1, 1896. Subsequently the specifications were modified so as to fix March 1, 1896, as the date for the erection of the drawspan, and September 15, 1896, for the final completion of the whole bridge.

The object of fixing March 1, 1896, for the completion of the drawspan was that navigation, which was likely to open at that place in the middle of March, should not be interrupted by the work of construction upon the bridge. This object was well understood by both parties to the contract.

The specifications forming a part of the contract provided that the dates given above were of the essence of the contract, and that no payment would be made for any work or material, as provided by the specifications and the contract, to be made with the contractor while he was in arrears in delivery or erection, and in case of the failure of the contractor to have the work completed by November 1, 1896,

he would be required to pay two hundred dollars ($200) per day as liquidated damages in consequence of such delay.

The specifications besides contained full details as to the method of doing the work and the supervision thereof by the Government officer in charge. They provided that the contractor would be required to remove the old superstructure without disturbing trains, and contained many express exactions looking to the execution of the work so as to enable the bridge to be continuously operated for the passage of trains during the progress of the contract. The contract contained the following clause:

"5th. If any default shall be made by the party of the first part in delivering all or any of the work mentioned in this contract, of the quality and at the times and places herein specified, then in that case the said party of the second part may supply the deficiency by purchase in open market or otherwise (the articles so procured to be of the kind herein specified as near as practicable), and the said party of the first part shall be charged with the expense resulting from such failure. Nothing contained in this stipulation shall be construed to prevent the chief of ordnance, at his option, upon the happening of any such default, from declaring this contract to be thereafter null and void, without affecting the right of the United States to recover for defaults which may have occurred; but in case of overwhelming and unforeseen accident, by fire or otherwise, the circumstances shall be taken into equitable consideration by the United States before claiming forfeiture for nondelivery at the time specified."

No provision was made for payment as such for any of the false work by which it was stipulated the whole bridge, including the drawspan, should be supported during the work of reconstruction, nor for the cost of removal of the same. The compensation stipulated was a given price per pound for the material to be placed in the new superstructure, and a fixed price per cubic yard for alterations in the old masonry

work, and for excavations for additional foundations in the new masonry work required.

"The claimant proceeded to fulfill the obligations of its contract, and erected the necessary false work, including that for the drawspan, ·and was proceeding with the erection of the drawspan itself on February 25, 1896, when, as a result of a rise in temperature, the ice in the river at that point moved, taking with it the false work and a substantial portion of the drawspan then in place. In the condition in which the work was at that time nothing could have been done to prevent the destruction of the work. In case the accident had not happened, the drawspan would have been completed by March 15, 1896, to such an extent that it could have been swung so as not to impede navigation. The claimant did not proceed with the erection of the drawspan as expeditiously as it might have done, particularly in that it did not procure the necessary material in the order necessary for erection of the drawspan. Said span might have been completed a considerable time before February 25, 1896, although the claimant was not bound to have it completed until March 1, 1896, by its contract. The United States was in no way responsible for any delays in the fulfillment of said contract, and was in no wise in default.

"After said accident Col. A. R. Buffington, United States ordnance officer in charge of the construction, together with several of his assistants, had a conference with the representatives of the claimant at the site of the bridge, and it was determined that the most feasible way of repairing the damage and going on with the construction of the drawspan was to erect said span upon the pivot pier running up and down the river, so that the erection of said drawspan should not interfere with navigation, which was likely to open at any time after March 1. It was further determined that the most feasible way of providing for railroad traffic during the erection of said drawspan was to put in place a temporary liftspan, which could be so operated as to allow the passage of vessels. There-

upon Colonel Buffington ordered the claimant to erect such liftspan, which the claimant did, at the expense of $6,683.59.

"Colonel Buffington's order was intended to meet an exigency caused by the imminence of an immediate opening of navigation, and to avoid the consequent large damage which would have been done to the shipping of the river and the property interests employed therein by the obstruction which would have been caused by work under the contract if navigation had opened about March 1, as might have been apprehended upon February 26.

"At the time of the conference . . . representatives of the claimant demurred to the erection of such liftspan. They claimed that the bridge company could proceed to repair the damage done by the accident and erect the drawspan on false work across the channel of the river prior to the opening of navigation. Colonel Buffington and his assistants maintained that this could not be done.

"Navigation opened in the season of 1896, on March 27. At the time of the accident it could not have been foreseen that navigation would not open several weeks prior to that date. Navigation on the river at this point is heavy and continuous from the opening of navigation. In case navigation had been interrupted up to the date when the drawspan could have been ready to swing, the damage to persons engaged in such navigation would have been greater than the expense of the erection and operation of such liftspan.

"The erection of the liftspan was necessary in order to provide for railroad traffic and the navigation on the river, and was the most feasible and the least expensive method of so doing.

"After the accident on February 25, 1896, the claimant proceeded to erect the drawspan, in accordance with the contract, and said drawspan was ready to swing June 1, 1896."

After the completion of the work a voucher was drawn for the final payment under the contract. This voucher recited the total sum agreed to be paid by the contract, deducted the

previous payments made to the bridge company and stated the balance, it being explained that this balance constituted the full and final payment to the contractor. The amount thus stated to be the sum finally due under the contract was received by the company and a receipt was signed on December 11, 1896, declaring that the amount received was "acknowledged as the final and full payment for all the material furnished, and for all the work performed under the said contract, and in full for all charges, claims, adjustments, differences or other alleged indebtedness incident to the work, or related to it in any manner whatever."

"At the time of signing this paper the claimant made no protest and understood that it covered all claims it had against the United States growing out of the erection of said bridge. The final completion of the work provided for in the contract was several months later than the time limited in said contract, and at the time said instrument was presented to plaintiff's agent for his signature he objected to signing it. Buffington then informed him if he did not so sign it as a final release of all claims, his instructions were to refer the whole matter, including claims for delay in the completion of the work, to the department. Claimant's agent then advised directly with his principal, after which he signed the instrument and received the final payment, at the same time, in reply to an inquiry by Colonel Buffington whether he signed without reservation, replied, 'You have our signature to the release as you handed it to me.' Before that time there had been dispute between the parties, both as to the liability of defendant for the liftspan and the plaintiff for delay in the completion of the work. No damages for delay were afterwards claimed or sought to be enforced against the claimant."

Upon these findings it is insisted that the court below erred in holding that the bridge company was not entitled to recover the amount by it expended for the erection of the temporary liftspan, because that work, done by the direction of the officer representing the United States, was not within the contempla-

tion of the contract, and no duty rested upon the bridge com-
pany to do such work. In other words, the contention is that
as the contract provided for supporting the old structure across
its entire length, including the drawspan, by false work which
was to hold the old structure until the new was completed,
when the false work should be removed, that the bridge com-
pany, when the damage caused by the melting of the ice took
place, was entitled to continue the use of the false work for
supporting the drawspan, although in so doing the navigation
of the river would be entirely obstructed. And upon the
assumption that such is the true interpretation of the contract
it is urged the final receipt which was given did not constitute
accord and satisfaction for the expenditure made concerning
the liftspan. In logical order the question of accord and satis-
faction resulting from the giving of the receipt when the final
payment was made would first arise for solution. As, however,
the contention that accord and satisfaction did not result from
the giving of the receipt rests upon the assumption that the
work done in the temporary erection of the liftspan was not
within the contract, and therefore was not embraced by the
receipt, it follows that we must, in order to dispose of the con-
troversy as to accord and satisfaction, consider and deter-
mine the nature and character of the obligations which the
contract imposed concerning the work done as to the liftspan.
For this reason, to avoid repetition, we come at once to the
fundamental question, that is the interpretation of the con-
tract, for the purposes of ascertaining whether the work referred
to was within the purview of the contract, for if it was that
will dispose of the whole controversy, including the claim of
accord and satisfaction.

The argument by which it is sought to support the con-
tention that the bridge company was entitled after the acci-
dent to continue the construction of the drawspan by the
erection of false work which would entirely bar the navigable
channel, insists that as the contract alone provided for the
method of construction by means of false work as a support

for the old structure during the performance of the contract, the contract must be construed as having authorized the bridge company to continue the use of the false work after the accident, even across the navigable channel, despite the injurious consequences to navigation which would have resulted. And from this right to use the false work to the destruction of navigation it is contended that there was no authority to direct the erection of the liftspan, and consequently an implied and contract liability on the part of the United States to pay the cost of the same when the span was erected under the order of the officer of the United States in charge. But we are of opinion that the interpretation of the contract upon which this proposition must rest is unsound, because it is not supported by the text of the instrument, and is not consonant with the intention of the parties as manifested by the text and as established as a necessary result of the findings below made.

In considering the text of the contract attention is at once attracted to the important stipulations as to the period in which the work should be carried on and completed, and to the difference between the time fixed for the completion of the work as to the drawspan and that as to the remaining spans. When the fact that the bridge spanned a great navigable river, and the duty of the Government to protect that navigability is borne in mind, moreover when the facts found by the court below as to the period when navigation would be suspended as the result of natural causes, is also considered in connection with the obligation which the contract imposed of completing the drawspan within such non-navigable period, we are of opinion that the contract must be interpreted as exacting that the means employed in constructing the drawspan should be such as would not operate to impede navigation. We think, therefore, that the contract must be held to have empowered the bridge company to use and retain the false work in the navigable channel only during the time expressly stipulated in the contract, and therefore to have im-

posed the duty after that period, if the exigencies of the situation required it, to perform the work on the drawspan in some other suitable manner consistent with the non-interruption of the navigation of the river.

This interpretation, which we think the contract requires, as we have said, is directly in accordance with the finding below, that the object of fixing March 1, 1896, for the completion of the drawspan was that navigation, which was likely to open at that place in the middle of March, should not be interrupted by the work of construction upon the bridge, and that this object was well understood by both parties to the contract.

The argument that because the contract and its specifications contained many minute stipulations looking to prevent the interruption of railroad traffic across the bridge, and no express requirement as to the preservation of the navigability of the river, therefore, under the rule that the inclusion of one is the exclusion of the other, it should be interpreted as not having contemplated the necessity for preservation of navigability when the terms of the contract are accurately considered, is self-destructive. We say this because if the provision of the contract as to the time for completing the drawspan be given its necessary significance as elucidated by the intention of the parties as expressly established by the findings below, it must result that the insertion of the requirement as to the construction of the drawspan within the period fixed, which was safely within the time when by the operation of nature there would be no navigation on the river, excludes the conception that the minds of the parties could have deemed it necessary to expressly provide for the contingency of the interruption of navigation by the execution of the work, when such interruption was impossible to arise if the duties which the contract imposed were executed according to their express requirements.

As the findings, beyond peradventure, establish that the liftspan was the most feasible and least expensive substitute

for the false work which could have been employed after the accident, and, as they also established, that the objection of the bridge company to pursuing that method was alone based upon the assumed right to complete the work by the use of false work in the navigable channel after the period stipulated in the contract—a right which we hold the bridge company did not enjoy—we think no express or implied obligation rested upon the United States to pay for the cost of the temporary liftspan and that the court below was correct in so holding.

Disposing of the case, as we do, upon the interpretation of the contract heretofore made, it is unnecessary to consider whether, even assuming that there could be a different interpretation, the bridge company would be entitled to recover, in view of the facts found below as to the state of the work on the drawspan at the time the accident occurred, that is, the backwardness of such work, which it was expressly found was due solely to the negligence of the bridge company.

*Affirmed.*