CONDON-CUNNINGHAM, INC., ET AL. V. DAY ET AL.

(No. 853345—Decided December 15, 1969.)

Common Pleas Court of Cuyahoga County.

*Mr. Malcolm D. Young, Messrs. Kitchen, Messner & Mays* and *Mr. Charles E. Merchant,* for plaintiffs.
*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. John L. Dowling,* for defendant.

McMahon, J. On March 29, 1962, Condon-Cunningham, Inc., and M. F. Velotta & Sons, Inc., a joint venture (hereinafter referred to as plaintiffs), entered into a contract with William P. Day, Henry W. Speeth and Frank M. Gorman, constituting the Board of County Commissioners (hereinafter referred to as defendant), to make certain highway improvements in Cuyahoga County, involving among other things the construction, improvement and partial relocation of Rockside Road from Brecksville Road to Turney Road.

The Agreement, Proposal and Contract Bond for this project (Plffs' Ex. 1) states what was incorporated by reference into the Contract (at Notice Sheet No. 2):

"The approved plans (Plffs' Exs. 2, 2A, 2B) together with any special specifications for this project (Plffs' Ex. 1) as well as the construction and material specifications (Plffs' Ex. 3) together with the general clause and covenants in effect at the time the contract is entered into will also be incorporated by reference as fully and completely as if bound in the contract and made a part thereof." (Parentheses and contents thereof added.)

In addition to the above referred to items specifically made a part of the contract, Soil and Foundation Investigation Reports (Jewell Report) for this project were made available as a source of supplementary information. These reports are summarized as *Soils—General Notes* (Plffs' Ex. 1 between the proposal and special specifications) with said summary containing the following statements:

"In addition to the soil profile there are on file * * * copies of Soil and Foundation Investigation Reports for this project.

"The S. & F. I. R. were prepared as a guide for design features incorporated in the project.

"The information contained in these reports is available for review by the contractor. The reports are not a part of the contract but are available as a source of supplementary information."

Soil profiles (Plffs' Exs. 4 and 5) were also made available to plaintiffs. Plffs' Ex. 5 contains the following note.

"The information shown by this subgrade profile was secured for the use of the County of Cuyahoga and is not to be construed as a part of the plans governing the construction of the project."

Plaintiffs state in their first cause of action that they prepared and submitted their bid for this project in reliance upon facts as set forth in the Proposals, Plans and Specifications prepared or caused to be prepared by the defendant and made available to prospective bidders for the purpose of preparing and influencing their bids. Plaintiffs further state that during the progress of the work required by the contract plaintiffs discovered certain misstatements of facts in the Proposals, Plans and Specifications, all of which were either known or should have been known by defendant: i. e. (1) as to the quality and quantity of materials to be excavated within the right-of-way; (2) that defendant had not made reasonable and sufficient soil tests and geological studies of the right-of-way areas. As a result of the material misstatements of fact plaintiffs were required to waste certain material as unsuitable, shown as suitable, and to replace said wasted material. Defendant admits the preparing of the Proposals, Plans and Specifications but denies all other material allegations.

Plaintiffs for their second cause of action restate the statements made under their first cause of action and ask for relief on the theory of breach of contract, in that:

(1) defendant failed to provide plaintiffs with suitable and sufficient material for placement within the embankment;

(2) defendant failed to provide plaintiffs with borrow area when defendant knew or should have known that the called for excavation was unsuitable and insufficient to complete the embankment;

(3) defendant made arbitrary, etc., demands upon plaintiffs during the performance of the work. Plaintiffs further state that they elected not to rescind the contract, but chose to complete their performance under protest. Defendant generally denies these allegations.

For their third cause of action plaintiffs state they were required to perform certain excavation work in addition

to that contemplated by the parties and set forth in the contract, and that they have not been compensated for additional material furnished in connection therewith. Defendants admit that plaintiffs were in some instances instructed to remove soft subgrade and to replace the area so excavated with suitable material, but further state that plaintiff was fully compensated for all excavation and all replacement material furnished in connection therewith.

For their fourth cause of action plaintiffs state that subsequent to the execution of the contract but prior to the time plaintiffs were authorized to proceed, third parties removed over 15,000 cubic yards of material from the Kaiser-Nelson Cut. Plaintiffs further state that it was in the contemplation of the parties that the plaintiffs would have the right to use this material on the job. Plaintiffs claim they had to bring in material from outside the right-of-way sources to make up the amount removed.

Defendant admits the removal and that it took place prior to the time plaintiffs were authorized to proceed but state further that the plans did not guarantee that the same conditions would be present when plaintiffs would be advised to proceed, that the plaintiffs at the time of commencing work knew said material had been removed but made no claim or protest, and that the removal of material was not essential to nor approved for completion of the contract.

Plaintiffs, as a fifth cause of action, state that they have fully performed and completed their part of the contract and that the defendant has accepted said work as being satisfactory; that a final estimate of the amount due plaintiffs was arrived at but that said amount is being withheld by the defendant until plaintiffs release defendant from any and all claims and demands arising out of the contract; that this demand is arbitrary, etc., and the refusal by defendant constitutes a breach of contract; that plaintiffs are entitled to said $35,000, plus interest. Defendant generally denies plaintiffs' claim under the fifth cause of action.

We will treat causes of action 1 and 2 as one cause of action as each one asks for the same damages and deals with the same matters.

The first cause of action seems to sound in tort and the second cause of action sounds in contract which is the one which seems more logical to the court.

The principal issue here is whether the contractors could rely upon information given to them and also other information made available to them concerning the moisture content of the soil found in the Kaiser-Nelson Cut. This information was gained through borings made by a Columbus engineer by the name of Jewell, who made these borings for and on behalf of Cuyahoga County in connection with this project.

As to plaintiffs' first and second cause of action, the statement most directly in question is located under the first Rockside Road heading on page 4 of the *"Soils-General Notes"*:

"The stiff to very stiff silty clay deposits were generally at or just above the optimum moisture content. The material moisture content of the firm to stiff silty clay between Elevations 655 and 620, however, is 5 to 15 percent higher than the optimum values. This soil can not be used without first drying it."

Plaintiffs stated in evidence at the trial that they relied on this information in preparation of their bid; that when they actually encountered the material referred to it was found to be much too wet to be easily dried, and in its present condition could not be used as fill. There is no question that the material encountered had a higher moisture content than anticipated after studying the *Soils-General Notes*, Jewell Report and Soil Profiles, and that extra expense was required for proper excavation and embankment of the area in question.

Defendant, in generally denying liability for any extra expense for additional borrow not contemplated in plaintiffs' bid, relies on the following provisions in the general specifications:

(1) Plaintiffs' Exhibit 3.

*E-1.01 Method A*

"This method provides for separate payment for Item E-1 Roadway Excavation and Item E-1 Embankment. The contractor shall control disposition of excavated waste material, wasting or using it in embankment as he desires. Payment for Item E-1 Embankment includes payment for furnishing material from sources other than excavation if needed to complete embankments, with no separate payment for borrow for planned embankments."

(2) Plaintiffs' Exhibit 3. 6-2104.

"G-2.04. Examination of Plans, Specifications, Special Provisions and Site of Work.

"The bidder is required to examine carefully the site of work, the proposals, plans, and specifications, and to read and acquaint himself with the contract form for the work contemplated. The bidder, in submitting a proposal, warrants that he has investigated and is acquainted with the conditions to be encountered by performing the work, including the character, quality and quantities of work to be performed and materials to be furnished, prevailing hourly wage rates for the area in which the project is located and the requirements of these specifications and special provisions and contract. It is mutually agreed that submission of a proposal shall be furnished prima facie evidence that the bidder has made such examination, and is satisfied as to all conditions which will effect the work."

Thus the position of the defendant seems to be that in view of all the disclaimers previously quoted and the express wording of E-1.01, Method A, it was up to the plaintiffs to get the job done however they saw fit, *i. e.*, either by drying the wet dirt and using it as fill or obtaining extra borrow—either way—the county was not to be charged for any extra expense.

Treating plaintiffs' first and second causes of action as one cause of action, the general rule of law is quite clear and is well stated in 76 A. L. R. 268 (1931), page 269:

"The general rule may be deduced from the decisions that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist

and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than so represented.''

This annotation points out that the general rule is especially applicable where the representation as to the condition is positive in which case the right of the contractor is not affected by the general language of the contract to the effect that he is expected to investigate facts for himself.

While the defendant contends that because of the various disclaimers the contractors had no right to rely upon the information given as to the moisture content of the soil, it does seem that it is a strange procedure to furnish the contractors with such information, to invite them to seek more detailed information from the county and to give them extensive boring reports in 11 elaborate pamphlets, which the county invites them to inspect, and then to say because of some of our disclaimers you may not use any of this elaborate information that obviously was obtained by us at much expense and, if you do rely on it, you are doing so at your peril.

In a somewhat similar case, *Hersey Gravel Co.* v. *State* (Mich. 1943), 9 N. W. 2d 567, the contractor obtained plans and specifications from the Highway Department and spent two days examining the proposed right-of-way and ''borrow pits.'' The blueprints which the contractor examined contained a notice of soil contents upon which the contractor claims his company based its bid. The contractor contends (page 568):

''If the material to be encountered had been of the character indicated by the drawings as represented directly or impliedly, the claimant could have completed the work at the contract price and would have earned a reasonable profit. By reason of the fact that the material actually encountered was not the kind indicated in the drawings and directly and impliedly represented to be out of a kind vastly more difficult and expensive to move as above set forth, the cost of completing the work of the contract was $59,622.27 in excess of the cost anticipated.''

In that case, as in our case, the notations of soil conditions in the plans on which plaintiff relies were subject to the provision:

"Soil notations shown on the plans are for information only and shall not be construed to relieve the bidders of their responsibility to satisfy themselves by examining the site of the proposed work as to soil conditions."

In that case the Supreme Court of Michigan permitted the plaintiff to recover the extra cost in encountering material that was more difficult and costly to handle than anticipated after studying the blueprints for the state highway project under contract.

In the Case of *Atlanta Construction Co.* v. *State* (Court of Claims of New York, April 1918), 175 N. Y. Supp. 453, the contractor was told that stone for a certain part of the road "shall be local material, the source of supply being one-half mile north of station 88 plus 00 and 133 plus 00 on the road to be improved." The contractor visited this site and the person living there said he could obtain such stone at the going prices. It was later discovered by the state and by the contractor that the person living at the site of the stone was a life tenant only and had no right to sell any of the stone. As a consequence of this, the contractor had to bring stone from some considerable distance.

In this case the contractor checked on the state's statement and found it to be true. Speaking about the state's statement as to where the material could be obtained, the court, on page 454 of the opinion, stated as follows:

"It was an unqualified statement that the contractor must use certain material from a certain place in the construction of the road. In this case the contractor did not rely upon this positive and unqualified statement of the state, which we think it had a right to do, but it went further and investigated for itself and was told by the one in possession of the stone that it could have it at the going price; but thereafter, when it came to build the road, it found that it could not get the stone because the one in possession thereof had simply a life estate in the premises so that here it seemed to us the state is defeated,

even on its own contention that the contractor should make the investigation for itself.

"It did do so, and such investigation confirmed the statement made by the state. It was therefore a mutual mistake of the state and of the contractor, but one into which the contractor was led by the certain order, direction and statements of the state. The state under such circumstances cannot be permitted to evade the responsibility for its own mistake in compelling a contractor to make a bid based upon the cost of delivering material which could not be obtained."

The language above quoted seems to bring this case close to the case we are considering. In our case the county had some core borings made and reported these to the contractor as to the moisture in the Kaiser-Nelson hill which had to be cut through. The county actually had made for it extensive borings reported in 11 elaborate pamphlets which the contractor was invited to and did examine before making his bid. The contractor made another type of test boring, not as reliable as the core borings, and made only a few. Also in our case the contract provided that the contractor was to visit the scene and make investigation for himself. There was also such a provision in the *Atlanta Construction Co.* v. *State case, supra.* The court, on page 454 (175 N. Y. Supp. 453) of the opinion, made this statement:

"That was a contract with similar provisions to the one here involved, and yet the Supreme Court of the United States held that the government was bound by its positive statement of fact, notwithstanding the contract required the contractor to investigate the scene of the contract and satisfy himself of the statements in the contract from his own investigation. The court there said, 'A government contract should be interpreted as are contracts between individuals with a view to ascertaining the intention of the parties and to give it effect accordingly * * *. In paragraph 33 the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants.'"

The court was here referring to the statement of the Supreme Court in *Hollerback* v. *U. S.*, 233 U. S. 165, 34 Sup. Ct. 533, 58 L. Ed. 898.

In the case of *Pitt Construction Co.* v. *City of Alliance* (C. C. A. 6th Circuit, April 9, 1926), 12 F. 2d 28, this problem was considered. In this case the contractor undertook a job to construct a coagulation basin to be built for the City of Alliance. The blueprints furnished by the city made a representation that it would be located with reference to existing ground surface as shown in cross-section and that the distance from such surface to the bottom was about 9′. It turned out to be only 3′. Held: this was a substantial misrepresentation rendering the city liable to the contractor for extra expense in moving dirt to make fill.

Passing on some of the questions that seem similar to our case, the court stated at page 30:

"It is urged that the contractor's duty to examine the premises carried an assumption by him of the risk that there might be an error of the class which developed. We think this contention unsound. Perhaps the contractor by the use of sufficient instruments and effort, or by reference to whatever elevation datum may be the accepted starting point in that locality, could have ascertained that the elevation of 1026′ above sea level would have been 3′ below the ground and not 9′ below, at the point indicated for the forward bottom corner of the structure. Perhaps not. Surveyors often disagree to that extent. So, too, in the case of *Hollerback* v. *U. S.*, 233 U. S. 171, 175 34 Sup. Ct. 553, 58 L. Ed. 898, the contractor need have sunk only 5′ to ascertain that there was rock where the specification showed there was not; but in this case as in that, the contractor was entitled to accept, and to formulate his bid in reliance upon, the representation of fact by the other party. In substance and effect we cannot distinguish that case from this. (See also, *U. S.* v. *Smith*, 256 U. S. 11, 41 Sup. Ct. 413, 65 L. Ed. 808, and cases cited on page 17; *Faber* v. *New York*, 222 N. Y. 255, 118 N. E. 609)."

In the instant case, one of defendant's contentions is that this was extra work and it had to follow the contract

provisions providing for extra work. In other words, certain conditions were to be met before extra work was to be recognized and compensated for under the contract. This was not extra work under the contract. This was additional work due to a breach of contract because plaintiffs were misled to their detriment under the contract by statements of the defendant.

Similar provisions were contained in the contract in the case of *Pitt Construction Co.* v. *City of Alliance, supra,* as are contained in the contract of the case at bar. The court in disposing of this contention in the City of Alliance case states as follows (12 F. 2d at page 31):

"The contract contains the usual provisions that the engineer shall determine all questions respecting the construction and meaning of the plans and contract, that his decision shall be conclusive in all cases, that his estimate shall be a condition precedent to the recovery of any compensation; also that there can be no compensation for extra work, unless a special arrangement was made for it as provided in the general contract. These contract provisions do not control this action. The suit is not brought to recover anything earned under the contract *or for extra work of the character contemplated by the contract*; it is brought to recover damages for the misrepresentation by which the contract was induced—or, to express the same substance in another form—to recover damages for not furnishing the agreed grade site. The right to recover such damages is not affected by provisions of this class. *Bates* v. *Rogers* (D. C.), 274 Fed. 659, 661, and cases cited: *Faber* v. *New York, supra*; *Grace Co.* v. *Chesapeake Co.* (C. C. A. 6), 281 Fed. 904." (Emphasis added.)

Another case we shall consider is *U. S.* v. *Spearin* (December 1918), 248 U. S. 132, 39 Sup. St. 59, 63 L. Ed. 166.

Spearin, a contractor, contracted to build for $750,800 a drydock in accordance with plans and specifications which had been prepared by the government. The site selected by it was intersected by a 6' brick sewer; it was necessary to divert and relocate a section thereof before the work of the construction of a drydock could begin.

About a year after the relocation of the 6' sewer there occurred a sudden and heavy downpour of rain coincident with a high tide. This forced the water up the sewer for a considerable distance for a depth of 2' or more. The internal pressure broke the 6' sewer, as so relocated, at several places; and excavation of the drydock was flooded.

Upon investigation it was discovered that there was a dam from 5 to 5-½' high in an adjacent 7' sewer; and that dam by diverting to the 6' sewer the greater part of the water had caused an internal pressure which broke it. Both sewers were part of the city sewage system but the dam was not shown either on the city's plans nor on the government's blueprints which were submitted to the contractor. On them the 7' sewer appeared to be unobstructed. The government officials concerned with letting the contract and construction of the drydock did not know of the existence of the dam. The site selected for the drydock was low ground; during some years prior to making the contract sued on, the sewers had from time to time overflowed to the knowledge of these government officials and others but the fact was not communicated to the contractor by anyone. He had, before entering into the contract, made his superficial examination of the premises and sought from the Civil Engineer's Office at the Navy yard information concerning the conditions and costs of the work; but he had made no special examination of the sewers or special inquiries into the possibility of the work being flooded thereby and had no information on the subject.

Promptly after the breaking of the sewer, Spearin notified the government that he considered the sewers under existing plans a menace to the work; that he would not resume the operations unless the government either made good or assumed responsibility for the damage that had already occurred and either made such changes in the sewer system as would remove the danger or assume responsibility for the damage which might thereafter be occasioned by the insufficient capacity and the location of the design of the existing sewers. The estimated cost of restoring the sewer was $3,875 and it was unsafe to both Spearin and the government's property to proceed with

the work with a 6' sewer in its then condition. The government insisted the responsibility for removing the existing condition rested on the contractor. After fruitless correspondence, the Navy annulled the contract. The court found for the contractor.

The Supreme Court discussed the general rule of law applying to construction contracts and the specific law as applies to some construction contracts on page 61 of the opinion (39 Sup. Ct. 59 at page 61):

"The general rules of law applicable to these facts are well settled. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered. *Day* v. *U. S.*, 245 U. S. 159, 38 Sup. Ct. 57, 62 L. Ed. 219; *Phoenix Bridge Co.* v. *U. S.*, 211 U. S. 188, 29 Sup. Ct. 81, 53 L. Ed. 141. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsistence of the soil. *Simpson* v. *U. S.*, 172 U. S. 372, 19 Sup. Ct. 222, 43 L. Ed. 482; *Dermott* v. *Jones*, 2 Wall. 1, 17 L. Ed. 762; but if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *MacKnight-Flintic Stone Co.* v. *Mayor*, 160 N. Y. 72, 54 N. E. 661; *Filbert* v. *Philadelphia*, 181 Pa. 530; *Bentley* v. *State*, 73 Wis. 416, 41 N. W. 338. See, *Sundstrom* v. *State of New York*, 213 N. Y. 68, 106 N. E. 924. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans and to inform themselves of the requirements of the work as is shown by *Christie* v. *U. S.*, 237 U. S. 234, 35 Sup. Ct. 565, 59 L. E. 933; *Hollerback* v. U. S., 233 U. S. 165, 34 Sup. Ct. 553, 58 L. Ed. 898, and *U. S.* v. *Stage Co.*, 199 U. S. 414, 424, 26 Sup. Ct. 69, 50 L. Ed. 251, where it was held that the contractor should be relieved if he was misled by erroneous statements in the specifications."

The court further stated on page 61:

"The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the

drydock had not contained the provision for relocation of the 6' sewer. But the insertion of the articles prescribing the character, dimensions and locations of the sewer imparted a warranty that if the specifications were complied with the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. *The obligation to examine the site did not impose upon him the duty of making a diligent inquiry into the history of the locality with a view to determining at his peril, whether the sewer specifically prescribed by the government would prove adequate.* The duty to check plans did not impose the obligation to pass upon their adequacy to accomplish the purpose in view. And the provision concerning contractor's responsibility cannot be construed as abridging rights arising under specific provisions of the contract." (Emphasis added.)

In *U. S.* v. *Atlantic Dredging Co.* (1920), 253 U. S. 1, 64 L. Ed. 735, 40 Sup. Ct. 423, the facts in this case as expressed in the syllabus are:

"The specifications upon which a dredging contract was based described the materials to be removed as believed by the government to be mainly mud and fine sand; declined to guarantee the accuracy of the description; required bidders to examine and decide for themselves; referred them to maps exhibiting results of test borings made by the government, confirming the description; declined to guarantee that such borings actually represented the character of the bottom over the entire vicinity in which they were taken, but expressed the government's belief that the general information thereby given was trustworthy. The representations were deceptive in that the test borings gave information to the government not imparted to the bidders, of materials more difficult to excavate than those shown by the maps and specifications."

Continuing the quote from the syllabus:

"*Held*: (1) That a contractor who relied upon such representations of the results of the borings and of the government's belief based thereon, and whose reliance was

confirmed by the government's approval of its plant—adapted only to lighter materials and submitted for inspection as to its adequacy pursuant to the specifications—was entitled to stop work after part performance and recover the difference between the cost of the excavation done and the amount received under the contract.

"(2) That this right was not lost by proceeding with the work and entering into a supplementary contract, after the heavier materials were encountered, but before the contractor learned of the results of the test borings and that they were inadequate.

"(3) The cause of action was in contract, not in tort."

This decision was reached, although it was stated that (page 2 of opinion):

"* * * bidders are expected to examine the work, however, and decide for themselves as to its character and make their bids accordingly, as the United States does not guarantee the accuracy of this description."

Again, the contract contains the statement that (page 4 of opinion):

"No guaranty is given as to the correctness of these borings in representing the character of the bottom over the entire vicinity in which they were taken, although the general information given hereby is believed to be trustworthy."

On page 11 of this opinion (253 U. S.), the court states:

"The case is, therefore, within the ruling of *U. S.* v. *Spearin*, 248 U. S. 132, 136, where it is stated that the direction to contractors to visit the site and inform themselves of the actual conditions of a proposed undertaking will not relieve from defects in the plans and specifications. Citing *Christie* v. *U. S.*, 237 U. S. 234; *Hollerback* v. *U. S.*, 233 U. S. 165, and *U. S.* v. *Utah, Nevada & California Stage Co.*, 199 U. S. 414. It is held in those cases 'that the contractor should be relieved, if he was misled by erroneous statements in the specifications.' The present case is certainly within the principle expressed. In the cited cases there was no qualification of the requirements. In this case it was accompanied by an expression of belief, and the conduct which was in effect a repetition and confirmation of

the belief and gave assurance that it had a reliable foundation. The company, therefore, was justified in acting upon it."

In *U. S.* v. *Smith*, 256 U. S. 11, 65 L. Ed. 808, 41 Sup. Ct. 416, the syllabus states sufficient facts for our purpose and reads as follows:

"1. In the performance of a contract with the United States for the excavation of a channel to specified depths under attached specifications describing the materials to be removed as clay, sand, gravel and boulders in unknown proportions, deposits consisting largely of limestones were encountered, the removal of which entailed an expense per cubic yard much exceeding the price fixed by the contract for the materials therein specified. The engineer officer in charge of the work arbitrarily classified these deposits with material described by the specifications; ignored the protest of the contractors and their request that a new price be fixed therefor; and required them to proceed under threats that, otherwise, they would be declared in default and the work taken from them and completed and the cost recouped from the retained percentages of their pay already earned and through legal proceedings against themselves and their sureties. Held: That clauses in the contract making decisions of the officer as to quantity and quality of work final, requiring the contractors to observe his instructions and denying any claim for modification of the work not agreed to, or expressly required in writing,— were inapplicable and that the contractors were entitled to recover from the United States the cost of excavating the material not covered by the contract."

The court states, on page 13 of 256 U. S.:

"The work was not work provided for or required by the terms of the contract but extra and outside of the contract."

Another case bearing upon our problem is *Borough Construction Co.* v. *New York* (1910), 200 N. Y. 149, 93 N. E. 480. This case on its facts is probably not within the scope of our legal question but some general statements of law are helpful. At page 482 of the opinion (93 N. E. 480), we have the following quote:

"The learned counsel for the appellant, with considerable insistence, advances arguments applicable to an action brought to recover on contract for extra services and materials and leading to the conclusion that such recovery cannot be permitted because such materials and work were not called for or authorized in the manner prescribed by the contract. Of course on the premises formulated by counsel on this theory his conclusions are unimpeachable, but the answer to the entire argument is that this action does not rest on any claim for extra services or materials under the contract, but on an alleged breach of the contract by the city and its representatives whereby the respondent has suffered damages and the question is whether the action can be maintained on that line. I regard it as settled that it may; that within certain limits a contractor who is ordered by the proper representatives of the municipality to furnish materials or do work which the former thinks are not called for by his contract may under protest do as directed and subsequently recover damages because he has been so required even though it should turn out that the contractor was right and the official had no right to call on him to furnish such materials and do such labor under his contract."

Also, on page 482 of the same opinion, it is stated:

"It is insisted on behalf of the city that the plaintiff by obeying the orders of the engineer of construction requiring him to take up and re-lay the alleged improper work without making any claim for extra compensation at the time the changes were ordered or made or without making a new contract has waived any claim if he was entitled to any extra compensation. This proposition assumes erroneously that the plaintiff is seeking to recover extra compensation under the contract. This action is to recover damages for breach of the contract. * * * We are of the opinion that either of the remedies discussed (one being to comply with the improper direction and then bring an action for breach) was open to the plaintiff at his election."

No helpful purpose can be served by extending this opinion through the detailed discussions of other cases,

some of which are different on the facts but cite general law touching on our subject. Some of these cases are *Beckwith* v. *City of New York* (1913), 133 N. Y. Supp. 202; *Faber* v. *City of New York* (1918), 222 N. Y. 255, 118 N. E. 609; *Gearty* v. *Mayor of New York* (Ct. of Appeals, New York, 1902), 171 N. Y. 61, 63 N. E. 804.

This is one more thought before passing this subject matter. What were the bidders to do? Was each bidder to run these tremendously expensive core boring tests not knowing whether or not he would get the contract? Under defendant's contention there would be practically no bidders. A bidder would be faced with this dilemma. Shall I bid on what is presented to be and run the risk of loss if the information is not correct or shall I run core boring tests at great expense, amounting to thousands of dollars, which expense I must bear on my own if I do not secure the contract?

The county, on the other hand, should know what soil they are dealing with in a project they have under consideration. The information, if gathered by the county, will be useful to the county no matter who gets the job The county should be the logical one to make the tests or have them made and not the bidders who may or may not get the job.

If the county has elaborate tests made and makes its finding known to the bidders, the bidders should be able to rely on these tests in all justice and fair play.

From the law gathered from these cases and from the facts as found by the court from the evidence, it is the conclusion and holding of this court that plaintiffs were misled, not deliberately, but nevertheless misled by the information obtained as to the soil content and the information they received from the Jewell Report. To their detriment they were required to furnish 203,845 cubic yards of additional material for embankment and they were thereby damaged in the amount of $117,537.02 which is the reasonable charge for the furnishing of the 203,845 cubic yards of borrow material.

Plaintiffs' third cause of action concerns itself with a supplemental agreement entered into by the parties on

July 29, 1965 (specifically items 1 and 2 dealing with extra excavation and embankment work now in question). While the plaintiffs admit to being paid for the extra excavation and embankment work itself, they contend that they were not paid for the additional borrow that was required to complete the embankment. They further contend that this was not planned embankment and thus not covered under Method A provisions.

Defendant, on the other hand, contends that plaintiffs have been fully compensated for all excavation and embankment material and relies on the following provisions:

(1) Plaintiffs' Exhibit 3. E-1.09(d) *Soft Subgrade*

"(d) Soft Subgrade. Where soft subgrade is encountered in cuts, due to no fault or neglect of the contractor, in which satisfactory stability cannot be obtained by moisture control and compaction as provided for under (a) and (b) of this Section, the unstable material shall be excavated to the depth required by the engineer. The excavation thus required shall be measured and paid for at the contract unit price bid for Item E-1 Roadway Excavation. Material thus excavated shall be disposed of in accordance with Section E-1.06.

"Under Method A, the excavation thus made shall be filled with suitable material placed in accordance with the compaction and moisture requirements of this Item and shall be paid for at the contract unit price for Item E-1 Embankment, Method A * * *."

(2) Plaintiffs' Exhibit 3. E-1.12 *Basis of Payment*

"E-1.12 Basis of Payment. The quantities measured as provided above shall be paid for at the contract unit price bid:

"Per cubic yard for Item E-1 Roadway Excavation, Method A. This price and payment shall constitute full compensation for performing all of the requirements of this item, except the compacting of subgrade when set up as a separate item, including furnishing all necessary materials, labor, tools, equipment, supplies and incidentals.

"Per cubic yard for Item E-1 Embankment, Method A. This price and payment shall constitute full compensation

for performing all of the requirements of this item for constructing embankment, including furnishing material from sources other than excavation necessary to complete planned embankment, and including furnishing all necessary materials, labor, tools, equipment, supplies and incidentals."

Defendant also points out that there was some contemplated removal and disposal of unsuitable material (*i. e.,* soft subgrade) covered by special contract provisions (*Soils-General Notes,* pages 1-8) but that nowhere does the county agree to pay for borrow in these cases.

It is the opinion of the court that the contract provisions quoted expressly support the position of the defendant. While the work covered by the supplemental agreement was not contemplated under the original contract, and thus not planned, the additional work was necessary to complete an embankment, and provide the proper base for pavement. Accordingly, the soft subgrade and payment provisions quoted above do apply and plaintiffs have already been fully compensated for its work as to this cause of action. The fairness of these provisions is not at issue.

On the third cause of action the court finds for the defendant and against the plaintiffs.

As to the plaintiffs' fourth cause of action, the testimony adduced at the trial reveals that subsequent to the awarding of the subject contract in September 1961, but prior to plaintiffs being given notice to proceed in the Kaiser-Nelson Cut in June 1962, third parties removed over 15,000 cubic yards of material from this area.

The following facts were also revealed at the trial: (1) Up to the time of the notice to proceed in the Kaiser-Nelson Cut, defendant did not actually have the right-of-way in this area—the plaintiffs were aware of this fact; (2) defendant did everything it could to speed up condemnation proceedings, as so urged by plaintiffs; (3) both parties knew that the third party who had control of the area was operating a sand and gravel business in this area and certain materials were being removed; (4) plaintiffs, though on the scene every dy and being aware the material

was being removed, made no investigation to determine what material was being removed and plaintiffs further made no protest concerning the removal of this material prior to the computation of the final estimate, that is, plaintiffs made no protest until the final estimate to either the defendant or to any third parties.

As the court feels that the conduct of the plaintiffs amounts to a waiver, the court will not go into any detailed discussion as to the basis of plaintiffs' claim further than to say that there seems to be some legal basis for the claim of plaintiffs if their conduct did not amount to a waiver. Plaintiffs knew that third parties were in charge of this area and knew that they were operating a sand and gravel business. Further, plaintiffs knew that material was being removed from this area by third parties. Now, since plaintiffs made no definite investigation of what was being removed so they could make a protest, and since plaintiffs were working in this very area every day with a full opportunity to see what was taking place, and since they raised this issue only after the material was gone, the court is going to hold for the defendant on the fourth cause of action of the plaintiffs.

As to the plaintiffs' fifth cause of action, the following contract provision is controlling:

"G-9.10. Acceptance and Final Payment. Before the final estimate is allowed the director may require the contractor to submit an affidavit from each and every subcontractor showing that all claims and obligations arising in connection with the performance of his portion of the contract have been satisfactorily settled. The improvement shall be inspected by the director, and if he finds the work is completed according to the contract, there shall be issued certificates of the amount of work done and the contractor shall receive the balance due on the contract. It is expressly stipulated that the state of Ohio shall make final acceptance and payment promptly after the contract has been fully completed and final inspection made. No payment shall be made for any unauthorized work." (Plaintiffs' Exhibit 3. G-9.10 Acceptance and Payment.)

The language of the contract states that "* * * the director *may* require the contractor to submit affidavits from each and every subcontractor showing that all claims and obligations arising in connection with the performance of his portion of the contract have been satisfactorily settled."

It is the understanding of the court from the evidence that the county in fact does not require an affidavit from each and every subcontractor as to his part of the contract but instead expects a certificate to the effect that all subcontractors have completed their work and satisfactorily settled all claims from the general contractor, in this case, the plaintiffs.

Now the certificate presented to the plaintiffs not only certified that all subcontractors and materialmen were fully satisfied and paid but this certificate stated in substance that the plaintiffs had no further claims against the county and set up a release of the county. This the plaintiffs refused to sign because of the claims that they had at that time which culminated in this lawsuit. This certificate appears as part of defendant's Exhibit M.

Since defendant arbitrarily withheld $35,000 from the plaintiffs unless they signed a waiver of all other claims, the court finds for the plaintiffs in the amount of $35,000, together with interest thereon from and after November 8, 1965, on its fifth cause of action.

In summary, for the reasons previously discussed, there will be judgment for the plaintiffs on the first and second causes of action in the amount of $117,537.02 and judgment for the plaintiffs on the fifth cause of action in the amount of $35,000, together with interest thereon from and after November 8, 1965. Judgment for the defendant on the third and fourth causes of action. The costs will be charged against the defendant.

*Judgment accordingly.*