**DiGIOIA BROTHERS EXCAVATING, INC., Appellee,**

v.

**CLEVELAND DEPARTMENT OF PUBLIC UTILITIES, DIVISION OF WATER, Appellant.**

[Cite as *DiGioia Bros. Excavating, Inc. v. Cleveland Dept. of Pub. Util., Div. of Water* (1999), 135 Ohio App.3d 436.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 75081.

Decided Nov. 29, 1999.

438

**440**

*John K. Lind*, for appellee.

*Cornell P. Carter*, Director of Law, and *Robert J. Lally*, Assistant Director of Law, for appellant.

PORTER, Administrative Judge.

Defendant-appellant, city of Cleveland, Department of Public Utilities, Division of Water, appeals from the jury verdicts and judgment awarding $604,602 to plaintiff-appellee, DiGioia Brothers Excavating, Inc., arising from installation of a water main on Hilliard Boulevard in Rocky River and Westlake, Ohio. The city claims that the trial court erred in directing a liability verdict in favor of plaintiff and not in favor of defendant and in failing to properly instruct the jury on disputed issues. We find merit in the appeal, reverse and enter judgment in part for the city, and remand the remaining issues for a new trial.

This action arises out of a breach-of-contract claim filed October 2, 1996, by DiGioia Brothers against the city, asserting that specific omissions of utility-interference references in the construction drawings resulted in damages for delay and that additional costs were incurred for pavement-replacement work not required by the contract.

In 1991, the city's water department implemented a multimillion-dollar program for the rehabilitation of the Crown Waterworks including the pump station and the water mains located on the west side of Cleveland beginning at Clague Road and I–90. Phase I involved the installation of a new underground water main beginning at the pump station at Clague Road and continuing west along Hilliard Boulevard. This was the new water main on which DiGioia Brothers worked, a stretch covering about three miles. Phase I needed to be completed before the winter of 1996 so that the Crown Waterworks Pump Station could be taken off line for a major rehabilitation. The new water main was designed to connect with other pump stations to supply fresh water during rehabilitation of the Crown facility.

Phase I of the Crown Project was designed by the engineering firm of Stilson & Associates under contract with the city. Stilson was required to identify the location of existing underground field utilities within the right of way. Stilson hired various MBE engineering firms to compile the necessary information to

plot the existing underground field utilities. Based upon that information, Stilson designed the installation of the new water main at specified depths and locations along mile markers in order to avoid the preexisting underground field utilities. In 1995, DiGioia was the successful low bidder.

The contract between the parties included the detailed specifications and construction drawings created by Stilson reflecting the underground utilities that DiGioia Brothers would have to work around. The contract called for DiGioia's work to be completed by November 1, 1995, for a fixed contract price of $5,491,300, which included a contingency allowance of $400,000. DiGioia's successful bid was $250,000 under the next closest bid.

At trial, one of DiGioia's principal claims was that twenty-six underground utility interferences were either not shown on the construction drawings or were shown in the wrong location and that this adversely affected the contractor's performance, causing a total delay of four and one half weeks during the seven-month project. The contract plans indicated four hundred fifty-five other utility interferences that were properly identified, including water lines, gas lines, sanitary sewer lines and storm sewer lines, *i.e.*, approximately ninety-five percent of the utilities ultimately found were correctly shown on the drawings.

The contract contained a detailed process for change orders at General Condition B–34. Mutually agreed change orders were issued for those undisclosed twenty-six utility interferences encountered, and $90,000 was allowed from the $400,000 contingency fund for the cost of doing this extra work. DiGioia never provided the city with any written correspondence or objections to the disposition of these change orders.

At trial, DiGioia claimed that it had been only partially compensated for the utility interferences and had been verbally assured by John Wood, the city's project manager, that it might obtain additional compensation for loss of productivity upon completion of the contract. The city contended that Wood had no authority to depart from the contract procedures. DiGioia never sought recovery through the change-order process for lost productivity associated with the utility interferences.

John Wood testified that he did not have authority to authorize additional payment and that he could only recommend that a claim be considered. Wood had discussions with his superior, Sal Provenzano, at SVMT, the city's program management consultant, over lost productivity. Provenzano determined that the only delay that was meaningful according to the contract was completion delay, *i.e.*, extension of performance time (a day of extension for each day of delay), not additional compensation. A preconstruction meeting held on February 22, 1995, established rules for communication on the project, including a rule not to accept verbal directions on changes in the work.

General Condition B–6 of the contract provided that in the case of any delay beyond the contractor's control, it was not entitled to assert against the city any claim other than for an extension of time in which to perform the work. Specifically, Section 01914, Part 1.01, Paragraph C of the contract provided that the cost of changing the position of underground utilities "shall not be an obligation of the Contractor under this Contract, but no claim for damage due to delay or any other cause by any change in location of the structures herein mentioned will be considered or allowed by the City." DiGioia also acknowledged that in the contract the city did not guarantee the accuracy of the information on utility interferences appearing in the contract drawings. Section 01916(A) stated that "no claim by the Contractor will be entertained by the City which claim is based on the failure to have indicated correctly any sewer or appurtenance."

DiGioia's project manager, Bruce Tuttle, who also estimated the bid for DiGioia, testified that he expected to encounter utility interferences not shown on the designer's plans. He acknowledged that as a matter of course there are utility interferences in every project that are not shown on the designer's plan drawings and that the contractor needs to estimate the amount of unknown but anticipated utility interferences, incorporate that estimate into the bid, and be responsible for that assumption. He had estimated that six utility interferences would be encountered and opined that the twenty-six interferences was an extreme amount.

DiGioia achieved substantial completion of the contract on time, *i.e.*, by November 1, 1995. DiGioia was also required by the contract to supply a certificate of substantial completion on which to list all outstanding claims. The certificate of substantial completion stated, "The acceptance of substantial completion payment shall constitute a waiver of all claims by the Contractor as unsettled at the time of the Application for Substantial Completion, and except for retainage sum due at final acceptance." On the certificate, DiGioia listed three outstanding claims: for additional pavement quantity, for improper crew deductions made by SVMT from the amount claimed by DiGioia on the authorized change orders related to utility interferences, and for additional test stations. According to DiGioia's calculations, its claim for improper deductions was valued at $37,036.00. However, DiGioia did not mention or reserve any claim for lost productivity (*i.e.*, delay damages) on the certificate.

The contingency amount in the contract was $400,000, roughly eight percent of the contract amount. According to the city's expert, Gary Jentzen, DiGioia should have understood that there could be changes on the contract approaching the contingency amount. The actual negotiated amount of change orders ($90,-000) was only about three percent of the total contract value and about twenty-five percent of the contingency amount. Jentzen testified that even if the $37,500

amount of allegedly improper deductions claimed by DiGioia was added to the negotiated value of the change order ($90,000), the aggregate total was still substantially less than the contingency amount, indicating changes in work well within the anticipation of the parties.

DiGioia claimed that the twenty-six utility interferences complained of caused delays totaling four and a half weeks, for a claim of $309,336. However, according to DiGioia's own project manager, Bruce Tuttle, he achieved substantial completion of the project on time. Tuttle admitted, however, that he had submitted a project schedule that understated the production rate DiGioia's crews would be able to sustain on the water main project. The city's expert, Gary Jentzen, testified that DiGioia was not entitled to delay damages because it finished the project within the schedule prepared and submitted by DiGioia itself.

Besides delay damages, the parties also disputed recovery for pavement replacement, disagreeing over whether a concrete cutback was required by the contract documents. A concrete cutback is a shoulder constructed on each side of the water main trench prior to replacing the pavement. The cutback acts as a dry land bridge, which adds extra support in case there is some uneven settlement in the trench area. DiGioia claimed that the contract did not require a concrete cutback and that additional costs of $336,000 were incurred to construct the required cutback.

DiGioia's estimator, Bruce Tuttle, reviewed the plans and specifications to determine what the pavement requirements were under the contract. Prior to estimating this job, Tuttle had not performed any previous contracts that required pavement restoration to Cuyahoga County requirements. However, Tuttle was aware of the city of Westlake's requirement for concrete cutback pavement replacement prior to preparing his estimate.

Although DiGioia's expert, Martin Gallito, did not interpret the contract plans and specifications to include the concrete cutback requirement, he conceded that the city of Westlake had a cutback requirement and that the contract specifications indicated that DiGioia had to abide by the city of Westlake requirements. About twenty-five percent of the required work was within Westlake.

Following discovery and the overruling of the city's motion for summary judgment, this matter proceeded to trial on July 14, 1998. The city moved for a directed verdict at the close of DiGioia's case and at the close of all the evidence. The motions were denied.

DiGioia submitted two motions for directed verdict at the end of the case. First, DiGioia claimed breach of contract by the city and requested that the court direct the jury to determine only the issue of damages for DiGioia on the delay claims as a result of the undisclosed utility interferences. This motion for a

directed verdict was granted. Then, DiGioia made a second motion for a directed verdict on liability in its favor on the paving/cutback claims by arguing that the contract failed to show these paving requirements. The court overruled DiGioia's second motion for directed verdict. Nevertheless, the court instructed the jury:

"As a matter of law, I have found that the defendant, the City of Cleveland, breached its contract with the plaintiff, Digioia Brothers. There is a breach of contract in this case as a matter of law. Left for your determination is the question of damages, if any."

The jury returned a general verdict in DiGioia's favor for $604,602. This was broken down into six categories pursuant to Interrogatory No. 2. Judgment was entered for DiGioia on July 24, 1998, and defendant filed a timely notice of appeal herein. DiGioia's posttrial motion for prejudgment interest was granted at the statutory rate of ten percent per annum from October 30, 1995.

We will address the city's assignments of error in the order presented and together where appropriate.

"I. The trial court erred in directing a verdict for appellee on appellee's claim related to utility interferences where, construing the evidence most strongly in favor of appellant, reasonable minds could have reached a verdict in favor of appellant on appellee's claim related to utility interferences.

"II. The trial court erred in denying appellant's motion for directed verdict where, construing the evidence most strongly in favor of appellee, reasonable minds could reach only one conclusion and that conclusion was that appellee's claim related to utility interferences was barred by the contract."

The test for whether to grant a directed verdict was recently described by this court in *Avondet v. Blankstein* (1997), 118 Ohio App.3d 357, 364–365, 692 N.E.2d 1063, 1068:

"In ruling on a directed verdict motion, Civ.R. 50(A)(4), the court construes the evidence in the light most favorable to the party opposing the motion. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 119, 671 N.E.2d 252, 255; *Mitchell v. Cleveland Elec. Illum. Co.* (1987), 30 Ohio St.3d 92, 93, 30 OBR 295, 295–296, 507 N.E.2d 352, 353–354. The judge neither weighs the evidence nor determines the witnesses' credibility. *Wagner, supra; Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469. If the court finds that reasonable minds could come to but one conclusion and that conclusion is adverse to the party opposing the motion, the court should direct the verdict. *Wagner* and *Mitchell, supra.*"

We find, after a careful review of the record and the rulings below, that the trial court erred in granting a directed verdict in favor of DiGioia Brothers on the utility-interference liability issues. We hold, on the contrary, that the city was

entitled to a directed verdict on the utility-interference/delay-damages claim for the reasons hereinafter stated.

The reasoning behind the trial court's granting the directed verdict was stated by the trial court as follows:

"I'm of the opinion as a matter of law that the City of Cleveland breached its contract with the DiGioia Brothers. The question of damages is a matter for the jury. As it relates to the summary of additional costs, whether they be any additional work or extra work those subject matters can be argued to the jury by counsel. What I see here are plans, specifications, parts of the contract where there are loads of ambiguities.

"I have to determine, as it relates to the contract aspect of this case what was the intent of the parties. Well, everything is what's written by the City. It's true it's accepted by the brothers, but I resolve ambiguities in favor of the brothers. The fact that change orders were accepted, money was accepted in response to the change orders, that doesn't constitute waiver of the damage if any.

"Productivity still has to be determined. Everything DiGioia did was based on the actual or the apparent authority of Wood. Wood is the City's man. I know the contract contains conditions that are necessary where one can be paid for extra work. And in my opinion, the formal conditions of the contract need not be followed. I'm satisfied that the DiGioias are entitled.

"And whether you call it additional work or extra work for expenses made necessary by all these obstacles which were other than represented in the specification of the contract and such, if you will Contractors were misled by these plans and specifications. The city cannot excuse itself from liability having misled the Contractor, the plaintiff by reason of these misleading plans and specifications. You can't contract away your liability.

"The real question in my mind is where does the responsibility for this problem lie? Well, it doesn't lie with the City in the sense that they've delegated it to others. Whether it be Stilson or the V group and the other persons associated with the V group, the City is responsible. The City does have a cause over— against these other persons. The City has breached its contract as a matter of law."

Therefore, the trial court granted the directed verdict based on the premise that the city misled the plaintiff by submitting plans and specifications that did not accurately portray all of the utility lines. The court also found that no waiver occurred on the part of the plaintiff by failing to follow the contract's written requirements for change orders, since Wood gave oral instructions

otherwise. We find that the trial court erred in granting the directed verdict for several reasons. First, we find that there was no breach of contract.

■ As this court recently held in *Hoffman v. Levine* (Jan. 21, 1999), Cuyahoga App. No. 75012, unreported, at 2, 1999 WL 35325, that in construing the contract between the parties, the court's goal is to give effect to the intention of the parties as expressed therein:

■ "In the construction of any written agreement, a court's primary objective is to ascertain and give effect to the intent of the parties, which can be found in the language that they chose to employ * * *. The interpretation of a written agreement is, in the first instance, a matter of law for the Court. If it is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties * * *. It must give effect to the contract's express terms in determining the rights and obligations of the parties and cannot, in effect, create a new contract by finding an intent not expressed in the clear language used by the parties." (Citations omitted.)

■ "Where a written agreement is plain and unambiguous it does not become ambiguous by reason of the fact that in its operation it will work a hardship on one of the parties thereto and corresponding advantage to the other." *S & M Constructors, Inc. v. Columbus* (1982), 70 Ohio St.2d 69, 71, 24 O.O.3d 145, 146, 434 N.E.2d 1349, 1351, citing with approval *Ullmann v. May* (1947), 147 Ohio St. 468, 34 O.O. 384, 72 N.E.2d 63.

The contract between the city and DiGioia Brothers was unambiguous in designating responsibility for coping with the underground utilities:

"Section 01914

"Part 1 General

"1.01 Underground Utilities/Structures:

"A. The Contractor shall assume each property has gas, water, sewer, storm, telephone and cable utility connections. These connections may not be shown for each property on the Contract Drawings. The Contractor shall include in his bid price in the cost per lineal foot of water main the cost to brace, maintain service to the properties and to relocate and restore service as necessary * * *.

"B. Underground utilities, conduits, or other underground structures, including poles, indicated on the plans as to be relocated, shall be the responsibility of the Contractor either by him or by the respective utility after arrangements for that relocation has been approved by the respective utility. The cost for relocating underground utilities, conduits, or other underground structures, in-

cluding poles, indicated on the plans as to be relocated, shall be included in the cost per lineal foot of water main bid.

"C. Should it become necessary to relocate any other underground conduits, gas pipes, or other pipes, wires, facilities of any utilities, or structures of any character, not shown on the plans as specified, except water pipes, sewers and sewer house connections, in order to clear water main being installed under this contract, or should such change in positions be essential to the proper installation of the work structure, the Contractor shall notify the Director of the circumstances, study the location and nature of the structure involved and shall cease work if necessary, until proper arrangements can be made to care for the same. The cost of changing the position of any such structure, except water pipes, sewers, and sewer service connections, not shown on the plans or specified, shall not be an obligation of the Contractor under this Contract, but no claim for damage due to delay or any other cause by any change in location of the structures herein mentioned, will be considered or allowed by the City * * *.

"* * *

"E. For work to be done by the Contractor in connection with changes in sewers, see Section 01916, 'Changes in Sewers, Catch Basins.'

"1.02 Existing Utilities/Ohio Utilities Protection Service (O.U.P.S.)

"* * *

"C. By submitting his bid it is understood and agreed that the Contractor has considered all the permanent and temporary underground utility facilities, utility appurtenances and any structures in their present or relocated positions affecting this public improvement."

Section 01916 of the Contract further provides:

"Section 01916

"Changes in Sewers, Catch Basins

"Part 1 General

"A. The Contract Drawings show certain sewers and appurtenances, except house connections in certain locations. The City does not guarantee that all sewers and appurtenances are shown nor that locations given are accurate and no claim by the Contractor will be entertained by the City which claim is based on the failure to have indicated correctly any sewer or appurtenances."

According to these provisions of the contract, it was the responsibility of DiGioia to include in its bid the expected costs associated with utility interferences shown on the drawings. The city did not guarantee that all interferences were shown or accurately located on the drawings. However, if interferences

were not shown or were inaccurately located on the drawings, DiGioia had a duty to notify the city and would not be obliged to stand the cost of the necessary extra work. However, no damages for delay would be allowed for such undisclosed or mislocated interferences. Clearly, the above-quoted contract provisions alerted the contractor to the risk of undisclosed or inaccurately located utility interferences. During the work, the parties dealt with the additional work caused by these interferences through mutually agreed change orders totaling $90,000. There were no misrepresentations or ambiguities. See *S & M Constructors, Inc. v. Columbus* (1982), 70 Ohio St.2d 69, 24 O.O.3d 145, 434 N.E.2d 1349, syllabus:

"A municipality may disclaim in writing its liability to the contractor of a sewer construction project for additional expenses necessitated by conditions differing from those described in subsurface reports."

In *S & M Constructors,* the Supreme Court was confronted with a similar situation, in which a contract provision (SP–31) barred the contractor from asserting claims for unexpected subsurface conditions of which it had been warned. The unanimous court stated as follows at 72–75, 24 O.O.3d at 147–148, 434 N.E.2d at 1352–1354:

"SP–31 further provides: 'Said borings, test excavations, and other subsurface investigations, if any * * * are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claim against the City or the Engineer if, in carrying out the work, he finds that the actual subsurface conditions encountered do not conform to those indicated by said borings, test excavations, and other subsurface investigations.' Appellant argues that the difference between the conditions projected in the reports and the conditions actually found amount to misrepresentation. * * *

"Under the findings of the trial court, Mason's reports did not misrepresent the conditions. They were accurate as far as they went under SP–31; the reports were merely to be 'available on request' for bidders. In the absence of a showing of fraud or bad faith, a clear and unambiguous provision, such as SP–31, is both legal and enforceable. See *Ullmann, supra* (147 Ohio St. 468, 34 O.O. 384 [72 N.E.2d 63]). The disclaimer of warranty and appellant's agreement not to assert a claim are, therefore, controlling.

"* * * The reports themselves put readers on notice of potential discrepancies: 'It is concluded from the findings that subsurface conditions are extremely variable along the alignment of the sewer. Further, it is concluded that conditions on centerline of the sewer may vary to an unknown degree from conditions indicated by adjacent offset borings.' Appellant's authorities are, therefore, not controlling.

"Rather, SP–31 clearly disclaims any liability of appellee for differences between the conditions expected and those actually encountered. Appellant has argued the burdens of this type of provision. * * * Nevertheless, we need not speculate as to whether this provision encourages high bids or low bids, good bids or bad bids.

"Likewise, we need not decide whether 38 days was enough time for appellant to prepare its bid. We need only observe that SP–31 clearly and unambiguously limited the utility of the subsurface information. SP–31 is a specific provision in which appellant agreed to 'make no claim' against appellee based on the differences between the actual conditions and the preliminary subsurface information. Application and the clear and unambiguous language of SP–31, then, places this case within a basic tenet of contract law: 'Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered.' (Citations omitted.) [*U.S. v.*] *Spearin* [1918], *supra* (248 U.S. 132), at 136 [39 S.Ct. 59, at 61, 63 L.Ed. 166, at 169]. The trial court, therefore, properly extended judgment for appellee."

Although the plaintiff and the court below relied on *Condon–Cunningham v. Day* (1969), 22 Ohio Misc. 71, 51 O.O.2d 144, 258 N.E.2d 264, to support the directed verdict, that case is distinguishable. In *Condon–Cunningham,* the contractor was seeking direct expenses incurred in resolving the unanticipated problem of dealing with soil conditions that were different from those represented. In the case herein, the city did pay the plaintiffs the direct costs incurred in changing the location of undocumented utility interferences and did, in fact, pay in the form of change orders submitted in the amount of $90,000.

Furthermore, DiGioia's estimator, Bruce Tuttle, admitted that he did not completely rely on the plans and specifications, as there are unidentified utility lines on every job. In fact, he ordered extra piping in anticipation of six interferences. In *Condon–Cunningham,* the contractor completely relied on the contractee's representations in the detailed soil reports. We find that the outcome of this issue is governed by *S & M Constructors,* not *Condon–Cunningham.*

■ Furthermore, the "no damages for delay" provisions in the contract precluded any recovery due to the utility interferences. In addition to the previously discussed no-damages-for-delay provisions, Article B–6 provided:

"B–6 Delay for Causes Beyond Control.

"a. If the Contractor be delayed in the completion of the work by any act or neglect of the City, or by any other contractor employed by the City, or by changes ordered in the work; or by strikes, lockouts, fire, unusual delay by

common carriers, unavoidable casualties, or any cause beyond the contractor's control * * * then for all such delays and suspensions, the Contractor shall be allowed one calendar day extension beyond the time herein stated for completion of the work for each and every calendar day of such delay so caused in the completion of the work * * *.

"* * *

"c. No claims for damages or any claim other than for an extension of time as herein provided shall be made or asserted against the City by reason of any delays hereinbefore mentioned."

"The 'no damages for delay' clauses which exculpate a contractee from liability for damages suffered by a contractor by reason of being delayed in the performance of its work have generally been accepted as valid under Ohio law * * *." *Carrabine Constr. Co. v. Chrysler Realty Corp.* (1986), 25 Ohio St.3d 222, 228, 25 OBR 283, 287, 495 N.E.2d 952, 957. In *Carrabine,* the Supreme Court affirmed summary judgment for Chrysler because damages caused by the delay were "clearly within the contemplation of the parties" and Carrabine had entered into the contract and was bound by its terms. *Id.* See, also, *Avon Excavating Co. v. Parma* (Dec. 31, 1980), Cuyahoga App. No. 41557, unreported, 1980 WL 140377; *John E. Green Plumbing & Heating Co., Inc. v. Turner Constr. Co.* (C.A.6, 1984), 742 F.2d 965, 966; *E.C. Ernst, Inc. v. Manhattan Constr. Co.* (C.A.5, 1977), 551 F.2d 1026, 1029. The reasoning behind enforcing such clauses is to protect the public:

"[T]hey protect public agencies which contract for large improvements to be paid for through fixed appropriations against vexatious litigation based on claims, real or fancied, that the agency has been responsible for unreasonable delays." *Owen Constr. Co., Inc. v. Iowa State Dept. of Transp.* (Iowa S.Ct.1979), 274 N.W.2d 304, 306.

As the United States Supreme Court in *Wells Bros. Co. v. United States* (1920), 254 U.S. 83, 87, 41 S.Ct. 34, 35, 65 L.Ed. 148, 151, noted long ago:

"Men who take million-dollar contracts for Government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work."

■ There do exist, however, several recognized exceptions to the enforceability of a no-damage-for-delay clause. The exceptions consist of delay that "(1) was not intended or contemplated by the parties to be within the purview of the provision; (2) resulted from fraud, misrepresentation, or other bad faith on the

part of one seeking the benefit of the provision; (3) has extended such an unreasonable length of time that the party delayed would have been justified in abandoning the contract; (4) is not within the specifically enumerated delays to which the clause applies." *Jensen Constr. Co. v. Dallas Cty.* (Tex.App.1996), 920 S.W.2d 761, 770. We find that none of the above exceptions apply.

First, the delay attributed to utility interferences not detailed on the plans was clearly contemplated by the plaintiff. As stated above, the contract specifically stated that the city did not guarantee that all utility lines were documented. Two leading New York cases have confronted very similar clauses and enforced them. In *Corinno Civetta Constr. Corp. v. New York* (1986), 67 N.Y.2d 297, 502 N.Y.S.2d 681, 493 N.E.2d 905, and *Conduit & Found. Corp. v. New York* (1981), 52 N.Y.2d 1064, 438 N.Y.S.2d 516, 420 N.E.2d 397, the contractors were denied recovery of delay damages based on the explicit provisions in the contracts that stated that there was no guarantee that all of the subsurface obstructions were detailed. See *Corinno Civetta Corp.*, *supra*, 67 N.Y.2d at 314–315, 502 N.Y.S.2d at 689, 493 N.E.2d at 913 ("plaintiff expressly assumed responsibility for any 'loss or damages arising out of * * * any unforseen obstructions or difficulties which may be encountered' during performance of the contract, including damages 'caused or occasioned by his relying upon such records, reports or information furnished by any City Department.' That being so, it cannot recover damages for delays it suffered as a result of encountering unknown subsurface conditions."); *Conduit & Found. Corp.*, *supra*, 52 N.Y.2d at 1066–1067, 438 N.Y.S.2d at 518, 420 N.E.2d at 399 ("To the extent that damages * * * were premised on faulty plans which failed to disclose utility lines on Rust Street, the contract expressly provided that 'the contractor is cautioned that these locations [gas, electrical lines, etc.] are not guaranteed nor is there any guarantee that all such lines in existence, within the contract limits, have been shown on the plans.' Claimant assumed the risk that the sewer to be built might run afoul of existing utility lines, or be inconveniently proximate to them").

Bruce Tuttle testified that there are undocumented utility interferences on every project and that he did expect to encounter such interferences on this project. Section 01914, 1.01(C) specifically addressed possible delays regarding undocumented utility lines and stated that "no claim for damage due to delay or any other cause by any change in location of the structures herein mentioned, will be considered or allowed by the City." Based on this evidence it cannot be said that utility interferences were not within the contemplation of the parties when the contract was entered into. See *Carrabine v. Chrysler Realty Corp.*, *supra*; *W.C. James, Inc. v. Phillips Petroleum Co.* (C.A.10, 1973), 485 F.2d 22, 25 ("evidence showed that appellant knew from its experience that there were to be some delays in acquiring rights-of-way in connection with the supplemental job"

and he was therefore not entitled to damages for delay); *Marriott Corp. v. Dasta Constr. Co.* (C.A.11, 1994), 26 F.3d 1057, 1066 (contractor who was well aware of no-damages-for-delay clause and of possibility of delays, yet failed to protect itself against delays by increasing bid amount, was not entitled to delay damages).

Second, the city did not engage in fraud or misrepresentation in submitting the plans, since it advised the plaintiff that there might be utility structures unaccounted for. Furthermore, it can hardly be said that they engaged in fraud when they did, in fact, find and correctly identify ninety-five percent of the lines.

Third, the delay that resulted was not unreasonable given that the plaintiff substantially completed the work on October 30, 1995, before the contract completion date of November 1, 1995. Therefore, there was no delay for which DiGioia can claim damages, and any such claim was barred by the contract provision barring delay damages.

 In addition to the provision in the contract barring delay damages, the contract provided certain rules with respect to scheduling, early completion, and "float time," which are relevant to show that DiGioia was not entitled to delay damages. DiGioia claimed that it was delayed a total of four and a half weeks in the completion of the project. Despite the alleged delays, DiGioia finished the project on time. This apparent inconsistency is explained in large part by the testimony of DiGioia's project manager, Bruce Tuttle, who admitted that he knowingly submitted a false schedule for the project, which showed lower production rates than he actually anticipated for the work.

It necessarily follows from Tuttle's testimony that DiGioia's claim for damages due to lost productivity arose as a result of DiGioia's failure to complete the work in advance of the time it represented to the city that it would complete the work. By completing the job as represented in its false schedule, DiGioia merely lost whatever profit it hoped to gain by completing the job early. The parties allowed for that contingency and provided for failure to make early completion in Section 1310 as follows:

"1.06 If the Contractor should desire or intend to complete the Work earlier than any required milestone or completion date, the City or the Program Manager shall not be liable to the Contractor for any costs or other damages should the Contractor be unable to complete the Work before such milestone completion date."

This provision also precludes the damages claimed by DiGioia since it completed the work within the project schedule and any delays experienced by DiGioia did not affect the completion date for the project.

 DiGioia is not entitled to recover for loss of profits by not finishing the job ahead of its own misrepresented schedule. When dealing with the government, the contractor is obliged to "turn square corners" and comply with the contract provisions. *United States v. Wunderlich* (1951), 342 U.S. 98, 101, 72 S.Ct. 154, 156, 96 L.Ed. 113, 116; *United States ex rel. Compton v. Midwest Specialties* (C.A.6, 1998), 142 F.3d 296, 302.

 In short, the parties clearly contemplated and assigned responsibility for all utility interferences encountered on the project, whether they were shown on the plans or not. When a contract between a municipality and a contractor provides that a contractor will make no claim against the municipality based on differences between actual conditions and preliminary subsurface information and does so in a clear and unambiguous manner, the contractor will not be entitled to any additional expenses necessitated by conditions differing from those described in the subsurface reports. *S & M Constructors, Inc. v. Columbus, supra.* In this case, the city made an effective disclaimer by virtue of the foregoing contract provisions and DiGioia was therefore not entitled to delay damages for any utility interferences that were not shown in the plans. See, also, *Panzica Constr. Co. v. Ohio* (Sept. 5, 1985), Franklin App. No. 83–AP–1185, unreported, 1985 WL 10145.

 We also find the trial court erred in finding that John Wood's representation to the plaintiff that delay claims would be considered at the end of the project reduced any duty upon the plaintiff to follow the conditions for obtaining payment for extra work set out in the contract. DiGioia maintained throughout trial that it was still entitled to additional compensation regarding the matters negotiated in the change-order process. This is contrary to Article B–34, and is contrary to the Ohio Supreme Court decision of *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 678 N.E.2d 519. As the Supreme Court stated:

"It is generally recognized that, in the absence of express authority, an engineer, architect, superintendent or inspector in charge of or assigned to public building or construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing." *Id.* at 364, 678 N.E.2d at 528.

The parties also agreed in the preconstruction meeting of February 22, 1995, that no verbal directions or change would be accepted.

As the testimony indicates, DiGioia availed itself of the change-order procedure under the contract to obtain compensation ($90,000) for the cost of doing the extra work associated with the claimed utility interferences. The change-order procedure is detailed in Article B–34 of the contract, which provides:

"B–34 Changes or Modifications of Contract (Section 168 of the Charter of the City of Cleveland)

" 'When the prosecution of any work or improvement under contract becomes necessary, in the opinion of the Director of the appropriate department, to make alterations or modification in such contracts, such alterations or modifications shall be made only when authorized by the Council upon the written recommendations of such Director countersigned by the Mayor. No such alterations shall be valid unless the price to be paid for the work or materials, or both, under the altered or modified contract, shall have been agreed upon in writing and signed by the Contractor and such Director prior to authorization by Council.'

"* * *

"No claim by Contractor for an adjustment in the Contract Price shall be valid if not submitted in accordance with this Article, B–34."

As reflected by the trial testimony and trial exhibits including Exhibit II, Exhibit JJ, Exhibit KK, and Exhibit LL on fund transfers, a series of change orders were negotiated by the city and DiGioia in accordance with Article B–34. As held in the Ohio Court of Claims decision of *Spohn Corporation v. Ohio Dept. of Admin. Services* (Feb. 11, 1987), Court of Claims No. 81–01771, unreported:

"Plaintiff received extra compensation and allowance of time for the change order. If this did not fully cover plaintiff's expenses for the extra work necessitated by the change order, it is not the place of this court to rectify that. If a change order process is in place and the contractor receives extra compensation under it, that contractor may not later go to court seeking further compensation for work done pursuant to the change orders. *Vanlar Construction, Inc. v. County of Los Angeles* (1985), 217 Cal.Rptr. 53." *Id.* at 16.

Further, as held in *High Voltage Systems Div., L.E. Myers Co. v. Ohio Dept. of Transp.* (Dec. 19, 1978), Franklin App. No. 78 AP–88, unreported, change orders constitute part of the contract between the parties. Thus, a party has no right to unilaterally modify a contract to provide for payment on a basis different from that provided for in a negotiated change order. *Id.* at 14.

Furthermore, DiGioia expressly agreed in writing that it had no claims beyond those reserved as outstanding claims on the certificate of substantial completion. The certificate contained a written waiver, as follows:

"The acceptance of Substantial Completion payment shall constitute a waiver of all claims by the Contractor as unsettled at the time of the Application for Payment for Substantial Completion, and except for retainage sums due at final acceptance."

The outstanding claims listed on the certificate of substantial completion by DiGioia were as follows:

1. Additional Pavement Quantity

2. Crew Deductions

3. Additional Test Stations

Nowhere did DiGioia preserve an outstanding claim related to loss of productivity due to utility interferences. Therefore, according to the contract, these claims were waived.

Based on the foregoing, damages awarded to DiGioia for delay described in Interrogatory Two ($274,852) of the verdict form are reversed, and judgment will be entered in favor of the city on those claims.

DiGioia was also awarded $9,750 for redesign of plan errors according to Interrogatory No. 2. This award will also be set aside because DiGioia never presented a claim for redesign work in accordance with Article B–34 and was not entitled to such compensation as explained by the city's expert, Gary Jentzen, the city never requested the redesign work, and Tuttle was never paid by the plaintiff for the work.

As discussed above, enforcement of the contract between the parties would dictate that a directed verdict should have been granted in favor of the city rather than DiGioia on all claims except the pavement quantity issues.

Accordingly, Assignments of Error I and II are sustained, and judgment is entered in favor of the city on the utility interference claims.

"III. The trial court erred in its instructions to the jury and in the verdict form by instructing the jury that the only determination for the jury was the amount of damages.

"IV. The trial court erred in implicitly granting appellee's motion for directed verdict on the paving issue by instructing the jury that its only determination was the amount of damages since, construing the evidence most strongly in favor of appellant, reasonable minds could have reached a verdict in favor of appellant on the paving issue."

The parties sharply disputed whether the contract required DiGioia to include a concrete cutback in paving replacement for the lump sum fixed price. The parties experts disagreed on this point. The city contends that these disputed liability issues should have been submitted to the jury, but the trial court did not do so. The city contends essentially that the trial court erred because it overruled plaintiff's motion for a directed verdict on the paving-quantity/cutback-liability issue but then instructed the jury that the defendant

breached the contract and the only issue was damages. We agree that the trial court should have submitted both the liability and damage issues to the jury on paving quantity because these issues were disputed by conflicting evidence.

The Ohio Supreme Court has stated the rules that must be followed in submitting a case to the jury in *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585, as follows:

"A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury by the proof adduced. *Parmlee v. Adolph* (1875), 28 Ohio St. 10 [1875 WL 219], paragraph two of the syllabus. 'In submitting a case to the jury, it is the duty of the court to separate and definitely state to the jury, the issues of fact made in the pleadings, accompanied by such instructions as to each issue as the nature of the case may require * * *.' *Baltimore & Ohio RR Co. v. Lockwood* (1905), 72 Ohio St. 586 [74 N.E. 1071], paragraph one of the syllabus.

"Relying on the *Baltimore & Ohio RR. Co.* case, this court stated in *Simko v. Miller* (1938), 133 Ohio St. 345, 358 [10 O.O. 535, 541, 13 N.E.2d 914, 920], as follows: 'A jury is entitled to receive from the court such instructions in the general charge as will fully place it in possession of the issuable facts in controversy as pointed out by the pleadings and the evidence. In this case the jury did not receive such instructions, and the charge as a whole was misleading.* * * ' The court concluded that inasmuch as the issues raised by the pleadings were not fairly presented to the jury, prejudice resulted and a new trial was warranted. *Id.*

"It is thus clear that an incomplete charge will constitute grounds for reversal of a judgment where the charge as given misleads the jury. See *Columbus Ry. Co. v. Ritter* (1902), 67 Ohio St. 53 [65 N.E. 613]. A caveat expressed by this court long ago is still relevant today: A charge ought not only be correct, but it should also be adapted to the case and so explicit as not to be misunderstood or misconstrued by the jury. *Aetna Ins. Co. v. Reed* (1878) [1877], 33 Ohio St. 283, 295 [1877 WL 187]."

DiGioia made two motions for directed verdict: The first motion for directed verdict related to the utility-interference liability issue, and the court granted that motion. We have resolved that issue in our disposition of Assignments of Error I and II. DiGioia's second motion for directed verdict related to its claim for additional pavement quantity in the amount of $336,000. The court denied that motion.

The city argues that the very fact that plaintiff made the separate motions for directed verdict reflected the separateness of the issues and the need for independent analysis of the subject matter presented (claim for utility-interfer-

ence damages versus the claim for additional pavement quantity). Nevertheless, the court proceeded to instruct the jury that the city had breached the contract and that the only issue for the jury to determine was damages. This informed the jury that the court had resolved the liability issues *on both claims* in favor of the plaintiff and withdrawn the liability question from the jury on the pavement-quantity issue.

After the trial court's rulings on DiGioia's two motions for directed verdict, the city filed and submitted to the court a proposed verdict form that provided that the jury could find for either plaintiff or defendant on DiGioia's claim for additional pavement quantity. The verdict form submitted by the city provided for the jury to determine damages on DiGioia's utility-interference claims only.

However, contrary to its ruling denying DiGioia's motion for directed verdict on the paving claim, the court instructed the jury as follows:

"As a matter of law, I have found that the defendant, the City of Cleveland, breached its contract with the plaintiff, DiGioia Brothers. There is a breach of contract in this case as a matter of law. Left for your determination is the question of damages, if any."

 The court did not distinguish between the utility-interference claim and the paving claim, requiring the jury to conclude that the court had resolved liability issues against the city on both claims. The court proceeded to ask counsel if that instruction was satisfactory. Counsel for the city asked the court for clarification of what the jury was to find with respect to paving in accordance with the court's previous rulings on DiGioia's two motions for directed verdict. (Counsel for the city likewise noted additional objections to the jury charge.) The court responded:

"Well, here's what we're going to do. Namely, nothing. I told you, and I think I told you on the record that I will explain to the jury the breach of contract, which I did. And I told you that I would tell them of your retainage agreement, which I did. I shall not tell them anything more."

 This was contrary to the court's earlier ruling denying DiGioia's second motion for directed verdict. Thus, the trial court, in failing to clarify the ambiguity between the jury instruction and its rulings on DiGioia's two motions for directed verdict, erred in its instructions to the jury on DiGioia's claim for additional paving quantity. Contrary to plaintiff's contentions, we find that defense counsel adequately preserved the alleged error for appeal by submitting special verdict and interrogatory forms that would have clarified the matter.

 It is reversible error for a court to grant a judgment on general liability without reference to any specific finding as to any one cause of action or

directions on issues not disposed of. *Brannon, Gianuglou & Caras v. Buchanan* (Jan. 15, 1993), Montgomery App. No. 13210, unreported, 1993 WL 5557. In *Brannon,* the court granted a partial general judgment on liability, but without special findings on the separate causes of action and issues not disposed of. *Id.* at 2. The reviewing court held that the appellant had been prejudiced by the error, as further proceedings were necessary to make such determinations. *Id.* at 3. See, also, *Feeney v. Eshack* (1998), 129 Ohio App.3d 489, 718 N.E.2d 462 (trial court's failure to instruct jury on comparative negligence made charge as a whole misleading, and as a result, the issues were not fairly presented to the jury).

It follows that it would also be reversible error for a court to instruct a jury to determine damages based on a finding of general liability without reference to any specific finding as to any one cause of action or directions on issues not disposed of. In the present case, the court failed to instruct the jury as to the status of the additional-pavement issue, thus failing to give direction on an issue not disposed of, as is required by *Brannon.* We find that by doing so, the trial court committed reversible error.

We also note that counsel for DiGioia had even conceded that "there may very well be a jury issue on the additional pavement quantity issue."

Assignment of Error III is sustained. Assignment of Error IV is moot and will not be addressed. App.R. 12(A)(1)(c).

Judgment for the plaintiff is reversed, and judgment is entered for the city on the delay-damage issues. Judgment in favor of plaintiff on the pavement quantity issues is reversed, and the case is remanded for a new trial on those issues.

*Judgment reversed*
*and cause remanded.*

SPELLACY and KILBANE, JJ., concur.