[Cite as *R.E. Schweitzer Constr. Co. v. Univ. of Cincinnati*, 2010-Ohio-2649.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

R.E. SCHWEITZER CONSTRUCTION CO.

 Plaintiff

 v.

UNIVERSITY OF CINCINNATI

 Defendant
 Case No. 2007-02114

Judge Clark B. Weaver Sr.

DECISION

{¶ 1} Plaintiff brought this action alleging breach of contract. The case proceeded to trial on the issues of liability and damages.

{¶ 2} In June 2004, plaintiff was awarded a contract for a construction project entitled "Demolition, Disassembly & Site Restoration for Pavilions- Phase 1" which involved the removal of four temporary tent-like structures and their associated foundations, utilities, and other improvements. The contract provided that plaintiff would retain salvage rights to the removed structures.

{¶ 3} Shortly after the contract was executed, but before plaintiff had commenced work, defendant inquired as to whether plaintiff would relinquish its salvage right to the largest structure (tent), which had served as a temporary dining hall, so that the tent could be relocated to defendant's Clermont County Campus (CCC) for use as a gymnasium. On June 25, 2004, Robert Schweitzer, plaintiff's vice president and project manager, responded by e-mail to advise Peter Luken, defendant's project manager, that the tent was available and that plaintiff proposed to perform the demolition,

transportation, and reinstallation work for a total of $494,850. (Plaintiff's Exhibit 58.) Luken testified that defendant wanted to preserve the warranty on the tent which existed through the tent manufacturer, Sprung Instant Structures, Inc. (SIS).

{¶ 4} According to meeting notes that were prepared by Paul Bellman, the project manager for defendant's associate architect, THP, Limited, Inc. (THP), on July 1, 2004, the relocation of the tent to CCC was "under review." (Plaintiff's Exhibit 9.) On July 15, 2004, during another project meeting, Bellman announced that the relocation project was "a go."

{¶ 5} On August 16, 2004, plaintiff obtained a written quote from SIS to provide a "technical consultant" who would be available on site during the dismantling and reconstruction of the tent. (Plaintiff's Exhibit 13.) The quote states that the consultant would "provide information about membrane and/or parts installation and, if applicable, assembly and erection of the structure"; however, the consultant would not be authorized "to perform any other services." Schweitzer testified that the consultant would not perform any of the work disassembling or erecting the tent and that the role of the consultant would be to "witness" the work and to offer advice. On August 25, 2004, Bellman confirmed that participation by SIS was necessary for maintenance of the warranty. (Plaintiff's Exhibit 51.) SIS subsequently advised plaintiff that it would continue to honor the warranty if plaintiff engaged Florida Exposition Services (FES), a contractor experienced in the erection and disassembly of SIS tents, to perform the work. (Plaintiff's Exhibit 16.)

{¶ 6} On September 1, 2004, Schweitzer provided defendant with a "breakdown" of the quote that it had previously submitted for the removal and transportation of the tent. (Plaintiff's Exhibit 17.) The breakdown showed that the cost associated with consulting was $37,000, that the value of the structure was $79,000, and that the charge for salvage and removal of the tent was $89,661. Plaintiff's cost proposal also included amounts for "set up" costs related to the relocation at CCC; however, defendant subsequently solicited public bids for the site work and re-erection at CCC, which was eventually awarded to another firm under a separate contract.

{¶ 7} On September 30, 2004, plaintiff submitted a change order proposal to THP which showed that FES had been hired as a demolition subcontractor at a cost of

$50,906 plus $2,545.30, which represents a five percent markup, for a total of $53,451.30. Defendant eventually approved the change order proposal in all respects except for the costs related to FES, which defendant rejected as "double-dipping" inasmuch as demolition work was included in the scope of the original contract. (Plaintiff's Exhibit 29.) Schweitzer signed the change order to receive payment on the undisputed amount, noting that the change order represented only a "partial accord and satisfaction" for the work. (Defendant's Exhibit B.)

{¶ 8} In January 2005, plaintiff submitted its claim pursuant to Article 8 of the contract.[1] Pursuant to R.C. 153.12 (B) and 153.16 (B), plaintiff's administrative remedies were deemed to have been exhausted 120 days after the claim was submitted under Article 8.

{¶ 9} As an initial matter, defendant contends that plaintiff's complaint was not timely filed and is barred by the statute of limitations. The court notes that on August 27, 2007, the court issued an entry denying defendant's motion for summary judgment based upon the statute of limitations. The court determined that plaintiff had timely filed its complaint within two years after April 12, 2005, the date that plaintiff's administrative remedies were deemed to have been exhausted pursuant to R.C. 153.12(B) and 153.16(B).

{¶ 10} The evidence adduced at trial is not materially different from the evidence that was submitted in connected with the motion for summary judgment. In the entry denying summary judgment, the court found that "the only reasonable conclusion to be drawn from the undisputed evidence is that plaintiff's complaint was timely filed." Based upon the evidence submitted at trial and for the reasons set forth in the entry denying

---

[1]Article 8 provides as follows:

"8.1.1 Whenever the Contractor intends to seek additional compensation or mitigation of Liquidated Damages, whether due to delay, extra Work, additional Work, breach of Contract, or other causes arising out of or related to the Contract or the Project, the Contractor shall follow the procedures set forth in this Article. To the fullest extent permitted by law, failure of the Contractor to timely provide such notice shall constitute a waiver by the Contractor of any claim for additional compensation or for mitigation of Liquidated Damages.

"8.1.2 The Contractor shall make a claim in writing filed with the Associate and prior to Contract Completion, provided the Contractor notified the Associate, in writing, no more than ten (10) days after the initial occurrence of the facts, which are the basis of the claim."

summary judgment, the court finds that plaintiff's complaint was timely filed. See *Painting Co. v. Ohio State Univ.*, Franklin App. No. 09AP-78, 2009-Ohio-5710, ¶13-15. ("Under the terms of R.C. 153.12(B) and 153.16(B), plaintiff's cause of action for breach of contract accrued * * * when the 120-day period lapsed after plaintiff's appeal to the State Architect, regardless of whether the State Architect subsequently issued a final decision on the validity of plaintiff's claims.")

{¶ 11} In its action for breach of contract, plaintiff seeks to recover both the balance of the original contract amount that was not paid to plaintiff and compensation for additional work FES  performed which was itemized in the change order request but not approved in the change order that defendant issued.  Defendant asserts that the change order fairly compensated plaintiff for any additional work and that plaintiff is barred from pursuing additional compensation for that work by accepting compensation under the change order.  Defendant further asserts that plaintiff is not entitled to payment of any balance that might otherwise have been owed under the original contract inasmuch as plaintiff has failed to submit prevailing wage documents that are required for payment.

{¶ 12} Plaintiff received compensation for the cost of performing extra work associated with the salvage and transportation of the tent pursuant to the change order procedure which is set forth in Article 7 of the contract and provides in pertinent part:

{¶ 13} "7.1    CHANGE ORDER

{¶ 14} "7.1.1 The University, without invalidating the Contract, may order changes in the Work consisting of additions, deletions or other revisions, including without limitation revisions resulting from an extension granted in accordance with Paragraph GC 6.4.  To the extent the time for Contract Completion or the Contract Price is affected, the Contract may be equitably adjusted by Change Order in accordance with this Article and the Change Order Procedure and Pricing Guidelines (CO). * * *

{¶ 15} "7.1.1.5   The University reserves the right to cancel or modify any Change Order authorization. * * *

{¶ 16} "7.1.3     If the Contractor does not agree with the Change Order or written directive, the Contractor shall perform all Work;  however, the Contractor may

seek compensation including time in accordance with Article GC 8 for any such Work performed."

{¶ 17} Where the parties to a construction contract agree to a change order which they intend to provide complete compensation for a given change in the project, the party being compensated by the change order will be contractually foreclosed from seeking additional compensation related to that same project change. *DiGioia Brothers Excavating, Inc. v. Cleveland Dept. of Public Utilities, Div. Of Water* (1999), 135 Ohio App.3d 436, 454. Furthermore, change orders constitute part of the contract between the parties. *High Voltage Systems Division, The L.E. Myers Company v. Ohio Dept. of Transp.* (Dec. 19, 1978), Franklin App. No. 78AP-88. As such, a party has no right to unilaterally modify a contract to provide for payment on a basis different than that provided for in a negotiated change order. Id.

{¶ 18} However, when a dispute arose over the amount of the change order, Michael Sealey, THP's representative, proposed that Schweitzer sign the change order as it was written and that plaintiff continue discussions with both defendant and THP to resolve the difference "without holding [plaintiff] to the 'full satisfaction' phrase on the document." (Plaintiff's Exhibit 32.) On December 9, 2004, Schweitzer notified THP that plaintiff would submit "the signed change order B-5 as partial satisfaction (not complete) of the work involved." (Plaintiff's Exhibit 33.) When Schweitzer signed the change order he made a handwritten notation to show that the document represented only a "partial accord and satisfaction for all costs and time of performance related to the work." (Defendant's Exhibit 3.) Consequently, the change order does not bar plaintiff from pursuing its claim against defendant.

{¶ 19} It is undisputed that, pursuant to Article 7.1.1, defendant had the authority to change the scope of plaintiff's work and require that it pack, transport, and reassemble the tent at CCC. As discussed above, defendant directed plaintiff to begin work on the tent removal before defendant issued the change order in question. Plaintiff submitted its change order proposal which included pricing for demolition, transportation, storage, and re-erection of the tent before defendant informed plaintiff that it intended to solicit public bids for the site work and re-erection at CCC.

{¶ 20} Defendant asserts that the change order did not compensate plaintiff for demolition work performed by FES because such work was within the scope of the original contract. However, contrary to defendant's assertion, plaintiff had salvage rights under the original contact and there was no evidence to show that the parties had contemplated that plaintiff would dismantle the tent so as to maintain the manufacturer's warranty before plaintiff was directed to do so by defendant. On August 25, 2004, Bellman sent Schweitzer an e-mail which instructed that "Sprung Structures *needs to be involved for the demolition* [of the tent] and the reassembly at Clermont College for warranty purposes as discussed above." (Emphasis added.) (Plaintiff's Exhibit 51.) Based upon the evidence, the court finds that defendant directed plaintiff to perform additional demolition work which exceeded the scope of the work contemplated in the original contract by requiring plaintiff to perform the demolition in a manner that would preserve the manufacturer's warranty on the structure.

{¶ 21} In order to preserve the warranty, plaintiff communicated with SIS to obtain replacement parts and technical consultant services for the relocation project. The quote that plaintiff received from SIS did not include demolition work; however, Schweitzer was subsequently advised by SIS that if plaintiff chose to have FES dismantle and erect the tent without an SIS consultant, SIS would "continue to honor the guarantee that was supplied to [defendant] at the time of the original purchase." (Plaintiff's Exhibit 16.) Schweitzer testified that additional work was necessary to preserve the warranty and he informed Luken that plaintiff had retained FES to assist with the demolition and removal. According to Schweitzer, the $494,850 quote that he sent to Luken on June 25, 2004, included the cost to perform the additional work related to maintaining the warranty. (Plaintiff's Exhibit 58.) The evidence shows that plaintiff notified Bellman no later than September 30, 2004, that it had engaged FES to assist in dismantling and packing the membrane structure. (Plaintiff's Exhibit 22.) The court finds that plaintiff has proven by a preponderance of the evidence that the work performed by FES was necessary to comply with defendant's direction to maintain the warranty on the tent and defendant was aware that plaintiff had contracted with FES to perform such work.

{¶ 22} The issue before the court is whether the change order that defendant issued to plaintiff provided reasonable compensation for those changes. The evidence established that the parties contemplated that pursuant to Article 7 the contract would be "equitably adjusted by change order" to compensate plaintiff for the additional work. During the course of the demolition and removal, the parties continued to negotiate the cost and scope of the work. For instance, after plaintiff had submitted a "breakdown" of its proposal at defendant's request, the parties had further communications regarding the work which discussions included the condition of the tent liner and whether it would be cost-effective to replace the liner rather than to salvage it. (Plaintiff's Exhibit 17.) The letter that was enclosed with the September 1, 2004 quote breakdown stated that plaintiff intended to bill for both the removal costs and the value of the tent after the structure had been moved and stored at CCC. In his letter, Schweitzer stated that plaintiff continued to work on the preparation for removal of the inner liner of the tent and he commented on the condition of the liner, noting that it appeared to be "in good shape overall, other than minor patching." However, Schweitzer stated that in the event that defendant chose not to salvage the liner and instead "buy a new liner, there would be a credit representing [plaintiff's] avoided costs of not removing the liner." Schweitzer also noted that such costs would be "fairly significant" given work involved in salvaging the liner. Schweitzer requested that defendant inspect the interior of the tent and notify plaintiff whether it intended to reuse any of the interior materials so that plaintiff would not "waste time on those segments." (Plaintiff's Exhibit 17.)

{¶ 23} After hiring FES, plaintiff continued to communicate with defendant regarding the cost of performing the demolition work. Plaintiff also provided Bellman with an itemization of the material and labor costs associated with the work that FES performed. Schweitzer testified that defendant allowed plaintiff and FES to perform the demolition without objecting to plaintiff's price proposal and that defendant authorized plaintiff to proceed with the work based upon plaintiff's proposal. On November 29, 2004, Bellman notified plaintiff that the change order would be mailed and he acknowledged that the change order included payment for "additional labor and material for dining pavilion relocation" to CCC. (Plaintiff's Exhibit 28.) Schweitzer testified that the December 1, 2004 e-mail from Bellman was the first notification he had received

from defendant that the change order would not include payment for the costs related to FES. (Plaintiff's Exhibit 29.)

{¶ 24} Based upon the totality of the circumstances, the court finds that plaintiff acted reasonably when it contracted with FES to assist with the disassembly, packaging, and transport to CCC. Plaintiff paid FES for its work in disassembling and relocating the tent and it provided defendant with an invoice for that work. The court is persuaded by the greater weight of the evidence that defendant was aware that plaintiff had engaged FES as a consequence of defendant's direction to maintain the warranty on the tent and that most of the demolition work was completed before defendant raised an objection to the costs related to FES that were identified in plaintiff's change order proposal. Accordingly, the court finds that defendant committed a breach of the contract by issuing a change order which failed to make an equitable adjustment within the contemplation of the contract inasmuch as the change order did not compensate plaintiff for the work performed by FES. Finally, defendant asserts that plaintiff's claims are barred by plaintiff's alleged failure to submit proper prevailing wage documentation. However, Schweitzer testified that plaintiff has provided defendant with all such documents, including all required payroll and prevailing wage reports which were submitted at the end of each pay period. Schweitzer further testified that plaintiff provided defendant with the invoices from FES that were paid by plaintiff. According to plaintiff, defendant's argument that plaintiff failed to provide required prevailing wage documents was merely a pretext for defendant's refusal to make a fair and equitable adjustment for the work that was addressed by the change order. The court notes that the pay applications that plaintiff submitted to defendant regarding demolition and disassembly of the tent include an affidavit signed by Schweitzer which certifies that all subcontractors on the project had complied with the prevailing wage laws. (Plaintiff's Exhibit 26.) Furthermore, Schweitzer testified that defendant did not raise the issue of prevailing wage documentation until after it had made its decision to deny compensation for the work FES had performed.

{¶ 25} The court finds that Schweitzer's testimony was credible regarding the payroll and prevailing wage documents that plaintiff provided to defendant. Based upon the evidence, the court finds that plaintiff has satisfied its burden of proving that it

complied with the requirements of the contract. Accordingly, the court finds that plaintiff has established entitlement to an equitable adjustment for the dismantling and relocation of the tent.

{¶ 26} Schweitzer testified that the pay applications plaintiff submitted to defendant on October 6, 2004, represent an accurate statement of payments that were received by plaintiff. (Plaintiff's Exhibits 22 and 26.) According to the evidence, plaintiff received a partial payment from defendant, leaving $53,451 as the unpaid amount for the work that was performed by FES. Additionally, $14,280.82 was retained by defendant on the original contract. (Plaintiff's Exhibit 48.) Accordingly, plaintiff shall be awarded damages in the amount of $67,731.82.

{¶ 27} Plaintiff also asserts a claim for prejudgment interest. R.C. 2743.18(A)(1) provides that interest shall be allowed with respect to any civil action upon which a judgment or determination is rendered against the state for the same period of time and at the same rate as allowed between private parties to a suit. The award of prejudgment interest is controlled by R.C. 1343.03(A) which provides, in pertinent part, as follows: "[W]hen money becomes due and payable upon any * * * instrument of writing * * * the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract." In its pretrial brief, plaintiff states that it intends to file a motion for prejudgment interest pursuant to General Condition section 8.9.1, which provides that "[t]he rate of any prejudgment interest shall be at the average of the prime rate established at the commercial banks in the City of Cincinnati."

{¶ 28} The court finds that the money owed to plaintiff became due and payable on November 24, 2004, the date that the change order was approved, and that plaintiff is entitled to prejudgment interest. However, no evidence has been presented regarding the commercial rate of interest that was in effect at that time. Accordingly, the case shall be set for an evidentiary hearing to allow the parties to present such evidence.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

R.E. SCHWEITZER CONSTRUCTION CO.

    Plaintiff

    v.

UNIVERSITY OF CINCINNATI

    Defendant
    Case No. 2007-02114

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

       This case was tried to the court on the issues of liability and damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff. The case will be set for an evidentiary hearing on the issue of prejudgment interest.

_____
CLARK B. WEAVER SR.
Judge

cc:

Elizabeth L. Hutton
W. Kelly Lundrigan
3700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202

Gregory Mohar
Special Counsel to Attorney General
University of Cincinnati
650 University Pavilion
P.O. Box 210623
Cincinnati, Ohio 45221-0623

William C. Becker
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

AMR/cmd/Filed May 18, 2010/To S.C. reporter June 9, 2010