[Cite as *Tritonservices, Inc. v. Univ. of Cincinnati*, 2011-Ohio-7010.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

TRITONSERVICES, INC.

    Plaintiff

    v.

UNIVERSITY OF CINCINNATI

    Defendant

Case No. 2009-02324

Judge Clark B. Weaver Sr.

DECISION

{¶1} Plaintiff brought this action alleging breach of contract. The case proceeded to trial on the issues of both liability and damages.

{¶2} This claim concerns a public improvement project known as "Teachers' College/Dyer Hall Rehabilitation Phase II Demolition and Renovation Package" on defendant's campus. The project was subject to the public bidding requirements set forth in R.C. Chapter 153. On December 20, 2006, plaintiff submitted a bid for the HVAC portion of the project, which defendant rejected. Plaintiff subsequently filed an injunction action against defendant in the Hamilton County Court of Common Pleas; the injunction was granted, and, as a result, plaintiff was awarded the contract.

{¶3} While the injunction action was ongoing, defendant entered into contracts with each of the other prime contractors on the project. Empire Construction Co. (Empire) was selected as the general trades contractor and was also designated as the Lead Contractor. Pursuant to the contract documents, each prime contractor was required to complete its work within 450 days from the date specified in the Notice to

Proceed. Initially, the contract completion date for all contractors with the exception of plaintiff was June 6, 2008. After plaintiff was awarded the HVAC contract, defendant issued a Notice to Proceed with a commencement date of May 15, 2007, which resulted in a completion date of August 7, 2008. In the summer of 2007, plaintiff and defendant began negotiations to align plaintiff's contract completion date with that of the other contractors.

{¶4} At trial, plaintiff presented evidence which can be categorized into three separate claims for breach of contract: 1) improper execution of Change Order No. 005H (CO5); 2) improper rejection of its loss of productivity claim; and 3) improper assessment of liquidated damages.


## I. CHANGE ORDER 5

{¶5} The parties agree that as a result of plaintiff's late start on the project, plaintiff's work on the project was 61 days behind that of the other contractors. However, after defendant granted an extension of time to Empire for additional work, plaintiff was only 40 days behind.

{¶6} On August 17, 2007, Barrett Bamberger, defendant's project manager, sent an e-mail to Majid Samarghandi, plaintiff's owner, with a proposed change order for a 40-day acceleration of its schedule. The amount of the change order was $0. The description of the change order stated: "Adjust original contract time of 450 calendar days in order to make Triton Services' Contract Completion date correspond with the revised June 27, 2008 Contract Completion date of the other prime contractors." In the e-mail, Bamberger asked Samarghandi to submit documentation to support his request for compensation. (Plaintiff's Exhibit 30.) Negotiations continued and on November 6, 2007, Hubert "Les" Caseltine, plaintiff's project manager, sent Bamberger a change order pricing summary with a cover letter that stated: "This is the Change Order adjusted to match $35,000.00." (Plaintiff's Exhibit 36.)

{¶7} On December 28, 2007, Samarghandi signed and returned CO5. However, the description/justification section contained the following additional language: "It is further agreed that the compensation provided in this Change Order includes any and

all costs associated with the acceleration of certain schedule activities that may be required to maintain the revised Contract Completion date of June 27, 2008, as a result of delays caused by the closure of the 300 Level Mechnaical [sic] Room to perform asbestos abatement work by the University's abatement contractor."  (Plaintiff's Exhibit 45.)

{¶8} Caseltine testified that CO5 was intended only to compress the schedule by 40 days and that it had nothing to do with potential asbestos abatement claims. Caseltine noted that the words "asbestos abatement" do not appear anywhere in the November 6, 2007 change order pricing summary that he submitted to Bamberger.

{¶9} Samarghandi testified that he met with Bamberger on August 16, 2007, regarding an acceleration of the schedule.  According to Samarghandi, he "felt like a deal had been struck" on August 17, 2007, which was 40 days for $35,000. Samarghandi was adamant that he never discussed asbestos abatement with Bamberger during negotiations regarding CO5.

{¶10} Bamberger testified that he had ongoing discussions about CO5 with Samarghandi and Caseltine from August to December 2007.  According to Bamberger, at some point in November 2007, the parties agreed to the $35,000 figure.  Bamberger testified that he spoke to Samarghandi over the telephone after the November 29, 2007 "all clear" letter was finalized regarding asbestos abatement activities in the 300 level mechanical room.  (Defendant's Exhibit 16.)  According to Bamberger, he told Samarghandi during that phone conversation that he wanted CO5 to encompass any potential acceleration claims arising from the closure of the 300 level mechanical room for asbestos abatement, and he testified that he included that request in his December 17, 2007 e-mail, which states: "Hi Majid...attached please find the change order for revising Triton Services' contract completion date. *As we discussed and agreed to the other day, this change order also includes acceleration of certain schedule activities that may be necessary due to the closure of the 300 level mechanical room for abatement work.*  Please print out (2) copies of the attached change order, sign and date, and return both copies to me for further processing. * * *"  (Defendant's Exhibit 17.) (Emphasis added.)  Bamberger noted that Caseltine was also copied on the e-mail, and

that the only response he received was a signed change order.  Bamberger insisted that he was not trying to "pull a fast one" on Samarghandi.

{¶11} Samarghandi does not deny that he signed the change order as presented. However, he asserts that he mistakenly signed CO5 without reading it based upon his understanding that it solely regarded a 40-day acceleration of the schedule.

{¶12} The purpose of contract construction is to give effect to the intention of the parties, and such intent "is presumed to reside in the language they chose to employ in the agreement."  *Stoll v. United Magazine Co.*, Franklin App. No. 03AP-752, 2004-Ohio-2523, ¶7.  In construing a written agreement, common words appearing in the written instrument are to be given their plain and ordinary meaning "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the four corners of the documents."  Id. at ¶8, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, paragraph two of the syllabus.  Additionally, a court is not required to go beyond the plain language of an agreement to determine the parties' rights and obligations if a contract is clear and unambiguous.  *Custom Design Technologies, Inc. v. Galt Alloys, Inc.*, Stark App. No. 2001CA00153, 2002-Ohio-100.  "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined."  *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, citing *Alexander*, supra.

{¶13} "To constitute a valid contract, there must be a meeting of the minds of the parties, and there must be an offer on one side and an acceptance on the other side. * * * A signature on a contract is evidence that the minds of the parties met on the terms of the contract as executed; however, this evidence, or the inference drawn from the execution of the contract, can be rebutted."  *Altman Co. v. Primo Painting, Inc.* (May 5, 1998), Franklin App. No. 97APE09-1254.  (Internal citations omitted.)

{¶14} General Conditions (GC) Article 7 of the contract pertains to change orders.  Section 7.1.1.4 states:  "The Contractor understands and agrees that agreement to a Change Order is final and without reservation of any rights."  (Plaintiff's Exhibit 3, page 39.)  Moreover, CO5 states:  "This Change Order identifies and provides full and complete satisfaction for all direct and indirect costs, including interest and all

related extensions to the time for Contract Completion, for the described changes in the Scope of the Work." (Plaintiff's Exhibit 45.)

{¶15} Where the parties to a construction contract agree to a change order which they intend to provide complete compensation for a given change in the project, the party being compensated by the change order will be contractually foreclosed from seeking additional compensation related to that same project change. *DiGioia Bros. Excavating, Inc. v. City of Cleveland* (1999), 135 Ohio App.3d 436, 454. Furthermore, change orders constitute part of the contract between the parties. *High Voltage Systems Div., The L.E. Myers Co. v. Ohio Dept. of Transp.* (Dec. 19, 1978), Franklin App. No. 78AP-88. As such, a party has no right to unilaterally modify a contract to provide for payment on a basis different than that provided for in a negotiated change order. Id.

{¶16} Samarghandi did not deny receiving the e-mail from Bamberger referencing an agreement that had been reached "the other day." In fact, the evidence shows that Bamberger's e-mail was sent simultaneously with the final version of CO5 that Samarghandi signed and returned. The court finds that the execution and delivery of CO5 by Samarghandi on behalf of plaintiff created a binding amendment to the parties' contract in accordance with its terms. The language in CO5 is unambiguous: by signing CO5, plaintiff agreed to adhere to a contract completion date of June 27, 2008; agreed that the consideration for $35,000 was a full and complete satisfaction for any of its costs related to a 40-day acceleration of the contract completion date; and agreed that any claims relating to asbestos abatement in the 300 level mechanical room were resolved by CO5. As such, plaintiff is precluded, as a matter of law, from recovering damages for its loss of productivity as a result of asbestos abatement in the 300 level mechanical room. The court further finds that the language in GC Section 7.1.1.4 is unambiguous; therefore, CO5 was final, and plaintiff's claims with regard to CO5 must be denied.

## II. LOSS OF PRODUCTIVITY CLAIM

{¶17} Plaintiff asserts that throughout the project, it incurred substantial delays of its work as a result of events or occurrences that were within defendant's control. Plaintiff asserts that the unexpected discovery of asbestos containing material (ACM) in various parts of the building caused substantial delay in the baseline schedule, and that the abatement activities led to "leap frogging" from floor to floor, instead of proceeding with its work in an orderly fashion as contemplated in its bid. Plaintiff asserts that the presence of ACM presented significantly different site conditions than it had represented in the contract documents. In addition, plaintiff asserts that defendant had actual notice of the asbestos abatement delays because it was provided with plaintiff's daily reports which reflected the job site conditions, defendant's representatives attended the weekly job progress meetings during which delays were discussed, and because Empire sent defendant numerous letters about the asbestos delay. Plaintiff contends that its work was negatively impacted by a one-month delay for ceiling demolition that was performed by Empire, and by defendant's mismanagement of Empire and its scheduling consultant, EIC Services, Inc. (EIC). Although a recovery schedule meeting was held on December 13, 2007, no adjustment was made to the contract completion date of June 27, 2008. Plaintiff argues that defendant knew from at least December 2007 that the June 27, 2008 contract completion date would not be met due to various project delays which were within its sole control.

{¶18} In June 2008, Samarghandi discussed a potential change order with Bamberger to compensate plaintiff for its significant labor overruns as a result of the multiple delays on the project. (Plaintiff's Exhibit 50.) In response, Bamberger advised Samarghandi to submit a formal claim to comply with the requirements as set forth in GC Article 8. On July 14, 2008, plaintiff submitted a "loss of productivity claim" which delineated additional costs that it incurred due to delays, acceleration, and out-of-sequence work that had occurred over the course of the project. (Plaintiff's Exhibit 51.) The Associate, Kevin Kirk from Champlin/Haupt Architects, Inc., reviewed plaintiff's claim and prepared an analysis dated August 29, 2008, wherein he recommended that the claim be rejected because it was neither timely submitted nor properly supported as required by Article 8. (Plaintiff's Exhibit 67.) On September 8, 2008, Bamberger

notified plaintiff that its claim was deficient in that it had failed to comply with GC 8.1.3, including failure to submit a time impact analysis consistent with standard critical path methodology, and he advised plaintiff to submit additional documentation within 10 days of the notice. (Plaintiff's Exhibit 72.) On September 12, 2008, Samarghandi responded to the notice. On October 23, 2008, Bamberger issued his own decision wherein he rejected plaintiff's claim for failure to comply with the Article 8 requirements and he also noted that Article 7 and CO5 precluded any claim with regard to the 300 level of the mechanical room. (Plaintiff's Exhibit 85.) On November 3, 2008, plaintiff appealed the rejection of its claim to University Architect Mary Beth McGrew. (Plaintiff's Exhibit 88.) On December 11, 2008, Samarghandi submitted additional information to substantiate the claim. (Plaintiff's Exhibit 99.) However, on January 7, 2009, McGrew denied plaintiff's appeal of both its loss of productivity claim and its liquidated damages claim. (Plaintiff's Exhibit 103.)

{¶19} In McGrew's analysis of plaintiff's appeal, she agreed with Kirk and Bamberger that any claims related to the discovery of asbestos and its abatement from the 300 level mechanical room were satisfied with the execution of CO5. Furthermore, McGrew cited GC 6.2[1] for the proposition that the sole remedy for any claim of delay regarding the failure of Empire to timely complete its work was an extension of time, and noted that plaintiff had never requested any extension of time. McGrew also cited Article 8 to show plaintiff's notice and claim submission deficiencies, and noted that plaintiff's total cost analysis failed to comply with those requirements. In sum, defendant found that inasmuch as plaintiff failed to comply with the contract requirements, all of plaintiff's claims were waived.[2]

---

[1]GC 6.2 states: "EXTENSIONS

"6.2.1 If the Contractor is interfered with, disrupted, hindered or delayed at any time in the progress of the Work by any of the following causes, the time for Contract Completion shall be extended for such reasonable time which the Associate determines, in consultation with the University, has been caused by the interference, disruption, hindrance or delay in the Work:

"6.2.1.1 Due to suspension of the Work for which the Contractor is not responsible; * * *

"6.2.1.2 Due to an act or omission of any other Contractor; or

"6.2.1.3 Due to any unforeseeable cause beyond the control and without fault or negligence of the Contractor."

[2]"Waiver is an affirmative defense." *Cleveland Const., Inc. v. Kent State Univ.*, Franklin App. No. 09AP-822, 2010-Ohio-2906, ¶47. (Internal citations omitted.) Defendant bears the burden of proving waiver at trial. Id. at ¶48. The court notes that in its answer to plaintiff's complaint, defendant asserted

**{¶20}** GC Section 8.1.1 states: "Whenever the Contractor intends to seek additional compensation or mitigation of Liquidated Damages, whether due to delay, extra Work, additional Work, breach of Contract, or other causes arising out of or related to the Contract or the Project, the Contractor shall follow the procedures set forth in this Article. *To the fullest extent permitted by law, failure of the Contractor to timely provide such notice shall constitute a waiver by the Contractor of any claim for additional compensation or for mitigation of Liquidated Damages.*" (Emphasis added.)

**{¶21}** GC Section 8.1.2 states, in part: "The Contractor shall make a claim in writing filed with the Associate and prior to Contract Completion, provided the Contractor notified the Associate, in writing, no more than ten (10) days after the initial occurrence of the facts, which are the basis of the claim."

**{¶22}** GC Sections 8.1.1 and 8.1.2 set forth two conditions that must be satisfied by the contractor in order to maintain a claim for an equitable adjustment of the contract: notice and the filing of a claim. In order for a contractor to preserve a claim, the contractor must notify the Associate, in writing, of the basis of its claim no later than ten days after the initial occurrence of the facts that give rise to the claim. After that notice is given, GC Section 8.1.3 requires a contractor to submit a written claim within 30 days of submission of the written notice; the written claim must contain specific criteria as set forth in GC Section 8.1.3.1 through 8.1.3.10. After the claim is submitted, GC Sections 8.2 through 8.4 delineate the claim review process.

**{¶23}** With regard to the written notice requirement, GC Section 8.1.2 further states: "Every such written notice shall provide the following information to permit timely and appropriate evaluation of the claim, determination of responsibility and opportunity for mitigation[.]" Sections 8.1.2.1 through 8.1.2.5 set forth the requirements of the written notice to include the estimated amount of the claim, the identification of persons

---

the affirmative defense of waiver, including: failure to provide timely written notice of occurrences purported to have given rise to plaintiff's claims, failure to timely seek extensions of time, and failure to provide required supporting documentation necessary for defendant to evaluate and act upon its claims. (Answer, ¶42.) Furthermore, defendant asserted the express waiver of "claims for delay and additional compensation relating to the discovery and abatement of asbestos on the Project by executing [CO5]"; and waiver of "claims arising from the purported interference caused by other contractors and/or [defendant] by failing to give timely written notice thereof and by failing to request an extension of time within 10 days of the event giving rise to the alleged interference." (Answer, ¶43-44.)

and events responsible for the delay, the identification of activities on the construction schedule that are affected, anticipated impacts and anticipated duration of delay, and recommended action to avoid or minimize any interference, disruption, hindrance, delay, or impact.

{¶24} Plaintiff filed its loss of productivity claim on July 14, 2008. However, plaintiff did not file a written notice of the facts which are the basis of its claim within ten days after their occurrence. The court finds that the language in Article 8 is unambiguous. "When 'the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.'" *Cleveland Const., Inc.,* supra, at ¶29, quoting *Shifrin v. Forest City Ents., Inc.* (1992), 64 Ohio St.3d 635, 638. Moreover, "courts cannot decide cases of contractual interpretation on the basis of what is just or equitable." Id. at ¶31.

{¶25} Plaintiff asserts that defendant had actual notice of its potential loss of productivity claim from various sources: the weekly meetings, the daily logs, and Empire's written notice of its delay claims. However, plaintiff has failed to prove by a preponderance of the evidence that it notified the Associate in writing no more than 10 days after the initial occurrence of the facts which are the basis of its claim, as required per GC Article 8. Although Samarghandi testified that plaintiff's daily logs were submitted to defendant contemporaneously with their creation, Caseltine testified that the daily logs were provided to defendant on a random basis and that he could not identify which daily logs had been delivered or when they were delivered. However, assuming arguendo that the daily logs were delivered to defendant as they were generated, the court finds that the daily logs in and of themselves do not satisfy the notice requirements of GC Article 8. Although the daily logs contain a section that states: "ARE THERE ANY DELAYS EITHER FROM CONTRACTORS OR US? * * * IF YES, PLEASE DESCRIBE DELAY AND WITH WHOM IT WAS DISCUSSED," that language fails to comply with the specific requirements of GC Sections 8.1.2.1 through 8.1.2.5. Moreover, in that plaintiff filed its claim on July 14, 2008, pursuant to the contract provisions, the court finds that plaintiff has waived any claim regarding impacts

to the schedule that occurred prior to June 14, 2008. A review of plaintiff's loss of productivity claim shows that the delays that affected its schedule occurred from May 21, 2007 to April 30, 2008. Therefore, the court finds that plaintiff has failed to preserve its loss of productivity claim, and that defendant's rejection of such claim due to plaintiff's failure to comply with the Article 8 requirements was not a breach of contract.

{¶26} Plaintiff asserts that defendant's analysis of its loss of productivity claim did not comply with the time requirements as set forth in Article 8, and that accordingly, defendant breached the contract and such breach constitutes a waiver of the notice requirements set forth in Article 8. However, the court is not persuaded by that argument.

{¶27} "[W]aiver of a contract provision may be express or implied. * * * '[W]aiver by estoppel' exists *when the acts and conduct of a party are inconsistent with an intent to claim a right*, and have been such as to mislead the other party to his prejudice and thereby estop the party having the right from insisting upon it. * * * Waiver by estoppel allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights. * * * Whether a party's inconsistent conduct constitutes waiver involves a factual determination, * * * and such a factual determination is properly made by the trier of fact." *Lewis & Michael Moving and Storage, Inc. v. Stofcheck Ambulance Serv., Inc.*, Franklin App. No. 05AP-662, 2006-Ohio-3810, ¶29-30. (Internal citations omitted; emphasis in original.)

{¶28} The court notes that Bamberger advised Samarghandi to file an Article 8 claim after Samarghandi notified him of a desire for additional compensation in June 2008. However, the court cannot construe Bamberger's e-mail advising Samarghandi to file an Article 8 claim as a waiver of any notice requirements in the contract. In fact, Bamberger's response clearly shows that defendant intended to enforce the Article 8 requirements. Based upon the evidence presented, the court finds that defendant did not waive its right to enforce the terms of the contract. The court finds that the language of GC Article 8 is unambiguous. The court further finds that plaintiff's July 14, 2008 notice of its loss of productivity claim was untimely, and therefore, it has failed to preserve any claim it had for an equitable adjustment of the contract. Accordingly, the

court finds that pursuant to the terms of Article 8, any loss of productivity claims were waived when plaintiff failed to comply with the 10-day notice requirement. Therefore, the court finds that plaintiff has failed to prove by a preponderance of the evidence that defendant breached the contract with regard to the loss of productivity claim.

## III. IMPROPER ASSESSMENT OF LIQUIDATED DAMAGES

{¶29} Plaintiff also alleges that defendant improperly assessed liquidated damages against it for 38 days from June 28 to August 4, 2008, in the amount of $38,000. Plaintiff asserts that defendant assessed liquidated damages against it in retaliation for filing its loss of productivity claim. In the alternative, plaintiff alleges that defendant's failure to manage the construction schedule was the cause of plaintiff's untimely completion of the work. Plaintiff asserts that defendant's conduct was a breach of its duties under GC Article 5 to administer the contract in good faith and was also a violation of R.C. 4113.62(C)(1).[3]

{¶30} On September 3, 2008, Bamberger informed Caseltine that defendant had deducted $34,000 in liquidated damages from plaintiff's pending pay applications, which represented $1,000 per day from June 27, 2008, through July 31, 2008. (Plaintiff's Exhibit 69.) On September 8, 2008, Samarghandi sought a rescission of the assessment of liquidated damages by filing an Article 8 claim. (Plaintiff's Exhibit 73.) On September 23, 2008, Bamberger informed plaintiff that it had not deemed plaintiff's work substantially complete until August 4, 2008, and that defendant had assessed an additional $4,000 of liquidated damages. On September 26, 2008, plaintiff supplemented its Article 8 claim to include a request to rescind a total amount of $38,000 in liquidated damages.

---

[3]R.C. 4113.62(C) (1) states: "Any provision of a construction contract, agreement, or understanding, or specification or other documentation that is made a part of a construction contract, agreement, or understanding, that waives or precludes liability for delay during the course of a construction contract *when the cause of the delay is a proximate result of the owner's act or failure to act, or that waives any other remedy for a construction contract when the cause of the delay is a proximate result of the owner's act or failure to act*, is void and unenforceable as against public policy." (Emphasis added.)

{¶31} The Associate reviewed plaintiff's September Article 8 claim and recommended that the claim be rejected because plaintiff's work remained incomplete as of August 4, 2008, and because plaintiff had never requested an extension of the contract completion date. (Plaintiff's Exhibit 91.) On November 17, 2008, Bamberger rendered a decision wherein he agreed with the Associate's claim analysis, finding that plaintiff's claim for mitigation of liquidated damages was in essence a request for an extension of time, inasmuch as the contract completion date would have to have been extended in order to relieve plaintiff from incurring liquidated damages. (Plaintiff's Exhibit 92.) Samarghandi responded by contending that defendant had failed to effectively manage the project schedule and that the assessment of liquidated damages was unfair. On January 7, 2009, McGrew rejected plaintiff's September Article 8 claim, on the basis that plaintiff had failed to comply with GC Articles 6 and 8, and that any asbestos abatement claims were waived with the execution of CO5.

{¶32} Empire, as the Lead Contractor, engaged EIC to prepare a schedule for the work on the project pursuant to GC Article 4. On June 21, 2007, Caseltine accepted and signed the original baseline schedule which was prepared by EIC and had been accepted by each of the other prime contractors. On December 20, 2007, Caseltine signed and returned the revised baseline schedule, reserving rights with respect to two errors in the schedule, however, the revised baseline schedule's completion date remained June 27, 2008, the same date that was agreed to in CO5. Samarghandi testified repeatedly that plaintiff never asked for an extension of the contract completion date.

{¶33} The court finds that pursuant to GC 4.3.6.2, by accepting and signing off on the original and updated baseline schedules, plaintiff agreed to the sequences and durations of the activities in those schedules and obligated itself to perform in accordance with those schedules.[4] Inasmuch as plaintiff executed CO5 and signed the original baseline and revised baseline schedules, plaintiff was obligated to complete its work on the contract by June 27, 2008, or be assessed liquidated damages at the rate

---

[4]GC 4.3.6.2 states, in part: "The original or initially approved Construction Schedule and all subsequent Construction Schedules signed by the Contractor, the Lead Contractor and the Associate and

of $1,000 per day for each day thereafter that its work was incomplete.[5] Pursuant to the definitions in the contract documents, "Contract Completion" means "The date upon which all deficiencies noted in the Punch List have been corrected, the Contractor's Work is one hundred (100) percent complete, and the Contractor has complied with all conditions precedent to final payment and release of retainage." (Defendant's Exhibit 38, page D-2 of 6.)

**{¶34}** Plaintiff did not achieve Contract Completion until some time after August 4, 2008. Inasmuch as plaintiff never sought an extension of time to complete its work, absent evidence that defendant was the cause of any delay, plaintiff waived its right to seek mitigation of liquidated damages.[6] However, because plaintiff failed to comply with the notice provisions of Article 8 in its loss of productivity claim, the court likewise

---

[sic] shall serve as an affirmation that the Lead Contractor and the Contractor agree to and can meet the applicable requirements of the updated Construction Schedule."

[5]Article 3 of the HVAC contract states:

"3.1 The Contractor shall diligently prosecute and complete all Work such that Final Acceptance occurs on or before **450** consecutive days, following the date set forth in the Notice to Proceed. *Unless an extension of time is granted by the University* in accordance with the Contract Documents the period of time established in this paragraph is referred to as the time for Contract Completion.

"3.2 All Work to be performed under the Contract shall be completed within the established time for Contract Completion, and that each applicable portion of the Work shall be completed upon its respective milestone completion date, *unless the Contractor timely requests and the University grants an extension of time* in accordance with the Contract Documents.

"3.3 Failure to complete all Work within the period of time specified, or failure to have the applicable portion of the Work completed upon any milestone completion date, shall entitle the University to retain or recover from the Contractor, as Liquidated Damages, and not as a penalty, the applicable amount set forth in the following table for each and every calendar day thereafter until Contract Completion or the date of completion of the applicable portion of the Work, *unless the Contractor timely requests and the University grants an extension of time in accordance with the Contract Documents. * * *"* (Plaintiff's Exhibit 2.) (Emphasis added.)

[6]GC 6.3.1 states: "To the fullest extent permitted by law and subject to any limitations imposed when the cause for the delay is a proximate result of the University's act or failure to act pursuant to Section 4113.62, ORC, any extension of time granted pursuant to Paragraph GC 6.2 shall be the sole remedy which may be provided by the University. The Contractor shall not be entitled to additional compensation from the University or mitigation of Liquidated Damages for any delay, interference, hindrance or disruption, including, without limitation, costs of acceleration, consequential damages, loss of efficiency, loss of productivity, lost opportunity costs, impact damages, lost profits or other similar remuneration."

GC 6.4.1 states: "Any request by the Contractor for an extension of time shall be made by written notice to the Associate no more than ten (10) days after the initial occurrence of any condition which, in the Contractor's opinion, entitles the Contractor to an extension of time. Failure to provide such timely notice to the Associate shall constitute a waiver by the Contractor of any claim for extension, damages or mitigation of Liquidated Damages, to the fullest extent permitted by law."

cannot find that plaintiff complied with the notice provisions of Article 8 in its attempt to mitigate the assessment of liquidated damages. The court finds that plaintiff has failed to prove by a preponderance of the evidence that plaintiff gave the Associate timely written notice of any delay that it contended defendant was responsible for on the project.

{¶35} In sum, plaintiff has failed to prove that it requested an extension of the contract completion date, has failed to prove that it completed its work on the project prior to the contract completion date, and has failed to prove that it complied with the contract requirements to notify defendant of the basis of any delay claim. Therefore, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

TRITONSERVICES, INC.

      Plaintiff

      v.

UNIVERSITY OF CINCINNATI

      Defendant

Case No. 2009-02324

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

{¶36} This case was tried to the court on the issues of liability and damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
CLARK B. WEAVER SR.
Judge

cc:

Gregory Mohar
Special Counsel to Attorney General
University of Cincinnati
650 University Pavilion
P.O. Box 210623
Cincinnati, Ohio 45221-0623

William G. Geisen
2400 Chamber Center Drive, Suite 300
Ft. Mitchell, Kentucky 41017

William C. Becker
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Filed December 5, 2011
To S.C. reporter March 5, 2012